# HARPER ET AL. *v.* VIRGINIA BOARD OF ELECTIONS ET AL.

No. 48.   Argued January 25–26, 1966.—Decided March 24, 1966.*

*Allison W. Brown, Jr.,* argued the cause for appellants in No. 48.   With him on the brief were *Lawrence Speiser* and *Philip Schwartz.*

*Robert L. Segar* and *J. A. Jordan, Jr.,* argued the cause for appellant in No. 655.   With them on the brief were *Max Dean* and *Len W. Holt.*

---

*Together with No. 655, *Butts* v. *Harrison, Governor of Virginia, et al.,* also on appeal from the same court.

*George D. Gibson* argued the cause for appellees in both cases. With him on the briefs were *Robert Y. Button,* Attorney General of Virginia, *Richard N. Harris,* Assistant Attorney General, and *Joseph C. Carter, Jr.*

*Solicitor General Marshall* argued the cause for the United States, as *amicus curiae* in No. 48, by special leave of Court, urging reversal. With him on the brief were *Attorney General Katzenbach, Assistant Attorney General Doar, Ralph S. Spritzer, David Rubin, James L. Kelley* and *Richard A. Posner.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

These are suits by Virginia residents to have declared unconstitutional Virginia's poll tax.[1] The three-judge

---

[1] Section 173 of Virginia's Constitution directs the General Assembly to levy an annual poll tax not exceeding $1.50 on every resident of the State 21 years of age and over (with exceptions not relevant here). One dollar of the tax is to be used by state officials "exclusively in aid of the public free schools" and the remainder is to be returned to the counties for general purposes. Section 18 of the Constitution includes payment of poll taxes as a precondition for voting. Section 20 provides that a person must "personally" pay all state poll taxes for the three years preceding the year in which he applies for registration. By § 21 the poll tax must be paid at least six months prior to the election in which the voter seeks to vote. Since the time for election of state officials varies (Va. Code §§ 24–136, 24–160—24–168; *id.,* at § 24–22), the six months' deadline will vary, election from election. The poll tax is often assessed along with the personal property tax. Those who do not pay a personal property tax are not assessed for a poll tax, it being their responsibility to take the initiative and request to be assessed. Va. Code § 58–1163. Enforcement of poll taxes takes the form of disenfranchisement of those who do not pay, § 22 of the Virginia Constitution providing that collection of delinquent poll taxes for a particular year may not be enforced by legal proceedings until the tax for that year has become three years delinquent.

District Court, feeling bound by our decision in *Breedlove* v. *Suttles,* 302 U. S. 277, dismissed the complaint. See 240 F. Supp. 270. The cases came here on appeal and we noted probable jurisdiction. 380 U. S. 930, 382 U. S. 806.

While the right to vote in federal elections is conferred by Art. I, § 2, of the Constitution (*United States* v. *Classic,* 313 U. S. 299, 314–315), the right to vote in state elections is nowhere expressly mentioned. It is argued that the right to vote in state elections is implicit, particularly by reason of the First Amendment and that it may not constitutionally be conditioned upon the payment of a tax or fee. Cf. *Murdock* v. *Pennsylvania,* 319 U. S. 105, 113.[2] We do not stop to canvass the relation between voting and political expression. For it is enough to say that once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment. That is to say, the right of suffrage "is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress, acting pursuant to its constitutional powers, has imposed." *Lassiter* v. *Northampton Election Board,* 360 U. S. 45, 51. We were speaking there of a state literacy test which we sustained, warning that the result would be different if a literacy test, fair on its face, were used to discriminate

---

[2] Judge Thornberry, speaking for the three-judge court which recently declared the Texas poll tax unconstitutional, said: "If the State of Texas placed a tax on the right to speak at the rate of one dollar and seventy-five cents per year, no court would hesitate to strike it down as a blatant infringement of the freedom of speech. Yet the poll tax as enforced in Texas is a tax on the equally important right to vote." 252 F. Supp. 234, 254 (decided February 9, 1966).

against a class.[3]  *Id.,* at 53.  But the *Lassiter* case does not govern the result here, because, unlike a poll tax, the "ability to read and write . . . has some relation to standards designed to promote intelligent use of the ballot."  *Id.,* at 51.

We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard.  Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax.[4]  Our cases demonstrate that the Equal Protection Clause of the Fourteenth Amendment restrains the States from fixing voter qualifications which invidiously discriminate.  Thus without questioning the power of a State to impose reasonable residence restrictions on the availability of the ballot (see *Pope* v. *Williams,* 193 U. S. 621), we

---

[3] We recently held in *Louisiana* v. *United States,* 380 U. S. 145, that a literacy test which gave voting registrars "a virtually uncontrolled discretion as to who should vote and who should not" (*id.,* at 150) had been used to deter Negroes from voting and accordingly we struck it down.  While the "Virginia poll tax was born of a desire to disenfranchise the Negro" (*Harman* v. *Forssenius,* 380 U. S. 528, 543), we do not stop to determine whether on this record the Virginia tax in its modern setting serves the same end.

[4] Only a handful of States today condition the franchise on the payment of a poll tax.  Alabama (Ala. Const., §§ 178, 194, and Amendments 96 and 207; Ala. Code Tit. 17, § 12) and Texas (Tex. Const., Art. 6, § 2; Vernon's Ann. Stat., Election Code, Arts. 5.02, 5.09) each impose a poll tax of $1.50.  Mississippi (Miss. Const., §§ 241, 243; Miss. Code §§ 3130, 3160, 3235) has a poll tax of $2.  Vermont has recently eliminated the requirement that poll taxes be paid in order to vote.  Act of Feb. 23, 1966, amending Vt. Stat. Ann. Tit. 24, § 701.

As already noted, note 2, *supra,* the Texas poll tax was recently declared unconstitutional by a three-judge United States District Court.  *United States* v. *Texas,* 252 F. Supp. 234 (decided February 9, 1966).  Likewise, the Alabama tax.  *United States* v. *Alabama,* 252 F. Supp. 95 (decided March 3, 1966).

held in *Carrington* v. *Rash,* 380 U. S. 89, that a State may not deny the opportunity to vote to a bona fide resident merely because he is a member of the armed services. "By forbidding a soldier ever to controvert the presumption of non-residence, the Texas Constitution imposes an invidious discrimination in violation of the Fourteenth Amendment." *Id.,* at 96. And see *Louisiana* v. *United States,* 380 U. S. 145. Previously we had said that neither homesite nor occupation "affords a permissible basis for distinguishing between qualified voters within the State." *Gray* v. *Sanders,* 372 U. S. 368, 380. We think the same must be true of requirements of wealth or affluence or payment of a fee.

Long ago in *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370, the Court referred to "the political franchise of voting" as a "fundamental political right, because preservative of all rights." Recently in *Reynolds* v. *Sims,* 377 U. S. 533, 561–562, we said, "Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." There we were considering charges that voters in one part of the State had greater representation per person in the State Legislature than voters in another part of the State. We concluded:

> "A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln's vision of 'government of the people, by the people, [and] for the people.' The Equal Protection Clause

demands no less than substantially equal state legis-
lative representation for all citizens, of all places as
well as of all races." *Id.*, at 568.

We say the same whether the citizen, otherwise quali-
fied to vote, has $1.50 in his pocket or nothing at all,
pays the fee or fails to pay it. The principle that denies
the State the right to dilute a citizen's vote on account
of his economic status or other such factors by analogy
bars a system which excludes those unable to pay a fee
to vote or who fail to pay.

It is argued that a State may exact fees from citizens
for many different kinds of licenses; that if it can demand
from all an equal fee for a driver's license,[5] it can demand
from all an equal poll tax for voting. But we must
remember that the interest of the State, when it comes to
voting, is limited to the power to fix qualifications.
Wealth, like race, creed, or color, is not germane to one's
ability to participate intelligently in the electoral process.
Lines drawn on the basis of wealth or property, like
those of race (*Korematsu* v. *United States,* 323 U. S. 214,
216), are traditionally disfavored. See *Edwards* v. *Cali-
fornia,* 314 U. S. 160, 184–185 (Jackson, J., concurring);
*Griffin* v. *Illinois,* 351 U. S. 12; *Douglas* v. *California,* 372
U. S. 353. To introduce wealth or payment of a fee as a
measure of a voter's qualifications is to introduce a capri-
cious or irrelevant factor. The degree of the discrimina-
tion is irrelevant. In this context—that is, as a condition
of obtaining a ballot—the requirement of fee paying
causes an "invidious" discrimination (*Skinner* v. *Okla-
homa,* 316 U. S. 535, 541) that runs afoul of the Equal
Protection Clause. Levy "by the poll," as stated in

---

[5] Maine has a poll tax (Maine Rev. Stat. Ann. Tit. 36, § 1381)
which is not made a condition of voting; instead, its payment is a
condition of obtaining a motor vehicle license (Maine Rev. Stat.
Ann. Tit. 29, § 108) or a motor vehicle operator's license. *Id.,* § 584.

*Breedlove* v. *Suttles, supra,* at 281, is an old familiar form of taxation; and we say nothing to impair its validity so long as it is not made a condition to the exercise of the franchise. *Breedlove* v. *Suttles* sanctioned its use as "a prerequisite of voting." *Id.,* at 283. To that extent the *Breedlove* case is overruled.

We agree, of course, with Mr. Justice Holmes that the Due Process Clause of the Fourteenth Amendment "does not enact Mr. Herbert Spencer's Social Statics" (*Lochner* v. *New York,* 198 U. S. 45, 75). Likewise, the Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are un-constitutionally discriminatory, we have never been con-fined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of funda-mental rights. See *Malloy* v. *Hogan,* 378 U. S. 1, 5–6. Notions of what constitutes equal treatment for purposes of the Equal Protection Clause *do* change. This Court in 1896 held that laws providing for separate public facil-ities for white and Negro citizens did not deprive the lat-ter of the equal protection and treatment that the Fourteenth Amendment commands. *Plessy* v. *Ferguson,* 163 U. S. 537. Seven of the eight Justices then sitting subscribed to the Court's opinion, thus joining in ex-pressions of what constituted unequal and discriminatory treatment that sound strange to a contemporary ear.[6] When, in 1954—more than a half-century later—we repudiated the "separate-but-equal" doctrine of *Plessy*

---

[6] *E. g.,* "We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it." 163 U. S., at 551.

as respects public education [7] we stated: "In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when *Plessy* v. *Ferguson* was written." *Brown* v. *Board of Education,* 347 U. S. 483, 492.

In a recent searching re-examination of the Equal Protection Clause, we held, as already noted, that "the opportunity for equal participation by all voters in the election of state legislators" is required.[8] *Reynolds* v. *Sims, supra,* at 566. We decline to qualify that principle by sustaining this poll tax. Our conclusion, like that in *Reynolds* v. *Sims,* is founded not on what we think governmental policy should be, but on what the Equal Protection Clause requires.

We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined. See, *e. g., Skinner* v. *Oklahoma,* 316 U. S. 535, 541; *Reynolds* v. *Sims,* 377 U. S. 533, 561–562; *Carrington* v. *Rash, supra; Baxstrom* v. *Herold, ante,* p. 107; *Cox* v. *Louisiana,* 379 U. S. 536, 580–581 (BLACK, J., concurring).

Those principles apply here. For to repeat, wealth or fee paying has, in our view, no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or conditioned.

*Reversed.*

MR. JUSTICE BLACK, dissenting.

In *Breedlove* v. *Suttles,* 302 U. S. 277, decided December 6, 1937, a few weeks after I took my seat as a member

---

[7] Segregated public transportation, approved in *Plessy* v. *Ferguson, supra,* was held unconstitutional in *Gayle* v. *Browder,* 352 U. S. 903 (per curiam).

[8] Only MR. JUSTICE HARLAN dissented, while MR. JUSTICE CLARK and MR. JUSTICE STEWART each concurred on separate grounds.

of this Court, we unanimously upheld the right of the State of Georgia to make payment of its state poll tax a prerequisite to voting in state elections. We rejected at that time contentions that the state law violated the Equal Protection Clause of the Fourteenth Amendment because it put an unequal burden on different groups of people according to their age, sex, and ability to pay. In rejecting the contention that the law violated the Equal Protection Clause the Court noted at p. 281:

> "While possible by statutory declaration to levy a poll tax upon every inhabitant of whatsoever sex, age or condition, collection from all would be impossible for always there are many too poor to pay."

Believing at that time that the Court had properly respected the limitation of its power under the Equal Protection Clause and was right in rejecting the equal protection argument, I joined the Court's judgment and opinion. Later, May 28, 1951, I joined the Court's judgment in *Butler* v. *Thompson,* 341 U. S. 937, upholding, over the dissent of MR. JUSTICE DOUGLAS, the Virginia state poll tax law challenged here against the same equal protection challenges. Since the *Breedlove* and *Butler* cases were decided the Federal Constitution has not been amended in the only way it could constitutionally have been, that is, as provided in Article V [1] of the

---

[1] Article V of the Constitution provides:

"The Congress, whenever two-thirds of both Houses shall deem it necessary, shall propose amendments to this Constitution, or, on the application of the Legislatures of two-thirds of the several States, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the Legislatures of three-fourths of the several States, or by conventions in three-fourths thereof, as the one or the other mode of ratification may be proposed by the Congress; provided that no amendment which may be made prior to the year one thousand eight hundred and eight shall in any manner

Constitution. I would adhere to the holding of those cases. The Court, however, overrules *Breedlove* in part, but its opinion reveals that it does so not by using its limited power to interpret the original meaning of the Equal Protection Clause, but by giving that clause a new meaning which it believes represents a better governmental policy. From this action I dissent.

It should be pointed out at once that the Court's decision is to no extent based on a finding that the Virginia law as written or as applied is being used as a device or mechanism to deny Negro citizens of Virginia the right to vote on account of their color. Apparently the Court agrees with the District Court below and with my Brothers HARLAN and STEWART that this record would not support any finding that the Virginia poll tax law the Court invalidates has any such effect. If the record could support a finding that the law as written or as applied has such an effect, the law would of course be unconstitutional as a violation of the Fourteenth and Fifteenth Amendments and also 42 U. S. C. § 1971 (a). This follows from our holding in *Schnell* v. *Davis,* 336 U. S. 933, affirming 81 F. Supp. 872 (D. C. S. D. Ala.); *Gomillion* v. *Lightfoot,* 364 U. S. 339; *United States* v. *Mississippi,* 380 U. S. 128; *Louisiana* v. *United States,* 380 U. S. 145. What the Court does hold is that the Equal Protection Clause necessarily bars all States from making payment of a state tax, any tax, a prerequisite to voting.

(1) I think the interpretation that this Court gave the Equal Protection Clause in *Breedlove* was correct. The mere fact that a law results in treating some groups differently from others does not, of course, automatically amount to a violation of the Equal Protection Clause.

---

affect the first and fourth clauses in the Ninth Section of the First Article; and that no State, without its consent, shall be deprived of its equal suffrage in the Senate."

To bar a State from drawing any distinctions in the application of its laws would practically paralyze the regulatory power of legislative bodies. Consequently "The constitutional command for a state to afford 'equal protection of the laws' sets a goal not attainable by the invention and application of a precise formula." *Kotch* v. *River Port Pilot Comm'rs,* 330 U. S. 552, 556. Voting laws are no exception to this principle. All voting laws treat some persons differently from others in some respects. Some bar a person from voting who is under 21 years of age; others bar those under 18. Some bar convicted felons or the insane, and some have attached a freehold or other property qualification for voting. The *Breedlove* case upheld a poll tax which was imposed on men but was not equally imposed on women and minors, and the Court today does not overrule that part of *Breedlove* which approved those discriminatory provisions. And in *Lassiter* v. *Northampton Election Board,* 360 U. S. 45, this Court held that state laws which disqualified the illiterate from voting did not violate the Equal Protection Clause. From these cases and all the others decided by this Court interpreting the Equal Protection Clause it is clear that some discriminatory voting qualifications can be imposed without violating the Equal Protection Clause.

A study of our cases shows that this Court has refused to use the general language of the Equal Protection Clause as though it provided a handy instrument to strike down state laws which the Court feels are based on bad governmental policy. The equal protection cases carefully analyzed boil down to the principle that distinctions drawn and even discriminations imposed by state laws do not violate the Equal Protection Clause so long as these distinctions and discriminations are not "irrational," "irrelevant," "unreasonable," "arbitrary," or "in-

674

vidious." [2] These vague and indefinite terms do not, of course, provide a precise formula or an automatic mechanism for deciding cases arising under the Equal Protection Clause. The restrictive connotations of these terms, however (which in other contexts have been used to expand the Court's power inordinately, see, *e. g.*, cases cited at pp. 728–732 in *Ferguson* v. *Skrupa*, 372 U. S. 726), are a plain recognition of the fact that under a proper interpretation of the Equal Protection Clause States are to have the broadest kind of leeway in areas where they have a general constitutional competence to act.[3] In view of the purpose of the terms to restrain the courts from a wholesale invalidation of state laws under the Equal Protection Clause it would be difficult to say that the poll tax requirement is "irrational" or "arbitrary" or works "invidious discriminations." State poll tax legislation can "reasonably," "rationally" and without an "invidious" or evil purpose to injure anyone be found to rest on a number of state policies including (1) the State's desire to collect its revenue, and (2) its belief that voters who pay a poll tax will be interested in furthering the State's welfare when they vote. Certainly it is rational to believe that people may be more likely to pay taxes if payment is a prerequisite to voting. And if history can be a factor in determining the "rationality" of discrimination in a state law (which we held it could in *Kotch* v. *River Port Pilot Comm'rs, supra*), then whatever may be our personal opinion, history is

---

[2] See, *e. g.*, *Allied Stores of Ohio* v. *Bowers*, 358 U. S. 522; *Goesaert* v. *Cleary*, 335 U. S. 464; *Skinner* v. *Oklahoma*, 316 U. S. 535; *Minnesota* v. *Probate Court*, 309 U. S. 270; *Smith* v. *Cahoon*, 283 U. S. 553; *Watson* v. *Maryland*, 218 U. S. 173.

[3] "A statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it." *Metropolitan Co.* v. *Brownell*, 294 U. S. 580, 584 (Stone, J.).

on the side of "rationality" of the State's poll tax policy. Property qualifications existed in the Colonies and were continued by many States after the Constitution was adopted. Although I join the Court in disliking the policy of the poll tax, this is not in my judgment a justifiable reason for holding this poll tax law unconstitutional. Such a holding on my part would, in my judgment, be an exercise of power which the Constitution does not confer upon me.[4]

(2) Another reason for my dissent from the Court's judgment and opinion is that it seems to be using the old "natural-law-due-process formula" [5] to justify striking down state laws as violations of the Equal Protection Clause. I have heretofore had many occasions to express my strong belief that there is no constitutional support whatever for this Court to use the Due Process Clause as though it provided a blank check to alter the meaning of the Constitution as written so as to add to it substantive constitutional changes which a majority of

[4] The opinion of the Court, in footnote two, quotes language from a federal district court's opinion which implies that since a tax on speech would not be constitutionally allowed a tax which is a prerequisite to voting likewise cannot be allowed. But a tax or any other regulation which burdens and actually abridges the right to speak would, in my judgment, be a flagrant violation of the First Amendment's prohibition against abridgments of the freedom of speech which prohibition is made applicable to the States by the Fourteenth Amendment. Cf. *Murdock* v. *Pennsylvania*, 319 U. S. 105. There is no comparable specific constitutional provision absolutely barring the States from abridging the right to vote. Consequently States have from the beginning and do now qualify the right to vote because of age, prior felony convictions, illiteracy, and various other reasons. Of course the First and Fourteenth Amendments forbid any State from abridging a person's right to speak because he is under 21 years of age, has been convicted of a felony, or is illiterate.

[5] See my dissenting opinion in *Adamson* v. *California*, 332 U. S. 46, 90.

the Court at any given time believes are needed to meet present-day problems.[6] Nor is there in my opinion any more constitutional support for this Court to use the Equal Protection Clause, as it has today, to write into the Constitution its notions of what it thinks is good governmental policy. If basic changes as to the respective powers of the state and national governments are needed, I prefer to let those changes be made by amendment as Article V of the Constitution provides. For a majority of this Court to undertake that task, whether purporting to do so under the Due Process or the Equal Protection Clause amounts, in my judgment, to an exercise of power the Constitution makers with foresight and wisdom refused to give the Judicial Branch of the Government. I have in no way departed from the view I expressed in *Adamson* v. *California,* 332 U. S. 46, 90, decided June 23, 1947, that the "natural-law-due-process formula" under which courts make the Constitution mean what they think it should at a given time "has been used in the past, and can be used in the future, to license this Court, in considering regulatory legislation, to roam at large in the broad expanses of policy and morals and to trespass, all too freely, on the legislative domain of the States as well as the Federal Government."

The Court denies that it is using the "natural-law-due-process formula." It says that its invalidation of the Virginia law "is founded not on what we think governmental policy should be, but on what the Equal Protection Clause requires." I find no statement in the Court's opinion, however, which advances even a plausible argument as to why the alleged discriminations which might possibly be effected by Virginia's poll tax law are "irrational," "unreasonable," "arbitrary," or "invid-

---

[6] See for illustration my dissenting opinion in *Griswold* v. *Connecticut,* 381 U. S. 479, 507, and cases cited therein.

ious" or have no relevance to a legitimate policy which the State wishes to adopt. The Court gives no reason at all to discredit the long-standing beliefs that making the payment of a tax a prerequisite to voting is an effective way of collecting revenue and that people who pay their taxes are likely to have a far greater interest in their government. The Court's failure to give any reasons to show that these purposes of the poll tax are "irrational," "unreasonable," "arbitrary," or "invidious" is a pretty clear indication to me that none exist. I can only conclude that the primary, controlling, predominant, if not the exclusive reason for declaring the Virginia law unconstitutional is the Court's deep-seated hostility and antagonism, which I share, to making payment of a tax a prerequisite to voting.

The Court's justification for consulting its own notions rather than following the original meaning of the Constitution, as I would, apparently is based on the belief of the majority of the Court that for this Court to be bound by the original meaning of the Constitution is an intolerable and debilitating evil; that our Constitution should not be "shackled to the political theory of a particular era," and that to save the country from the original Constitution the Court must have constant power to renew it and keep it abreast of this Court's more enlightened theories of what is best for our society.[7]

---

[7] In *Brown* v. *Board of Education,* 347 U. S. 483, the Court today purports to find precedent for using the Equal Protection Clause to keep the Constitution up to date. I did not vote to hold segregation in public schools unconstitutional on any such theory. I thought when *Brown* was written, and I think now, that Mr. Justice Harlan was correct in 1896 when he dissented from *Plessy* v. *Ferguson,* 163 U. S. 537, which held that it was not a discrimination prohibited by the Equal Protection Clause for state law to segregate white and colored people in public facilities, there railroad cars. I did not join the opinion of the Court in *Brown* on any theory that segregation where practiced in the public schools denied equal protection in

It seems to me that this is an attack not only on the great value of our Constitution itself but also on the concept of a written constitution which is to survive through the years as originally written unless changed through the amendment process which the Framers wisely provided. Moreover, when a "political theory" embodied in our Constitution becomes outdated, it seems to me that a majority of the nine members of this Court are not only without constitutional power but are far less qualified to choose a new constitutional political theory than the people of this country proceeding in the manner provided by Article V.

The people have not found it impossible to amend their Constitution to meet new conditions. The Equal Protection Clause itself is the product of the people's desire to use their constitutional power to amend the Constitution to meet new problems. Moreover, the people, in §5 of the Fourteenth Amendment, designated the

---

1954 but did not similarly deny it in 1868 when the Fourteenth Amendment was adopted. In my judgment the holding in *Brown* against racial discrimination was compelled by the purpose of the Framers of the Thirteenth, Fourteenth and Fifteenth Amendments completely to outlaw discrimination against people because of their race or color. See the *Slaughter-House Cases,* 16 Wall. 36, 71–72; *Nixon* v. *Herndon,* 273 U. S. 536, 541.

Nor does *Malloy* v. *Hogan,* 378 U. S. 1, stand as precedent for the amendatory power which the Court exercises today. The Court in *Malloy* did not read into the Constitution its own notions of wise criminal procedure, but instead followed the doctrine of *Palko* v. *Connecticut,* 302 U. S. 319, and made the Fifth Amendment's unequivocal protection against self-incrimination applicable to the States. I joined the opinion of the Court in *Malloy* on the basis of my dissent in *Adamson* v. *California, supra,* in which I stated, at p. 89:

"If the choice must be between the selective process of the *Palko* decision applying some of the Bill of Rights to the States, or the *Twining* rule applying none of them, I would choose the *Palko* selective process."

governmental tribunal they wanted to provide additional rules to enforce the guarantees of that Amendment. The branch of Government they chose was not the Judicial Branch but the Legislative. I have no doubt at all that Congress has the power under § 5 to pass legislation to abolish the poll tax in order to protect the citizens of this country if it believes that the poll tax is being used as a device to deny voters equal protection of the laws. See my concurring and dissenting opinion in *South Carolina* v. *Katzenbach, ante,* p. 355. But this legislative power which was granted to Congress by § 5 of the Fourteenth Amendment is limited to Congress.[8] This Court had occasion to discuss this very subject in *Ex parte Virginia,* 100 U. S. 339, 345–346. There this Court said, referring to the fifth section of the Amendment:

> "All of the amendments derive much of their force from this latter provision. It is not said the *judicial power* of the general government shall extend to enforcing the prohibitions and to protecting the rights and immunities guaranteed. It is not said that branch of the government shall be authorized to declare void any action of a State in violation of the prohibitions. *It is the power of Congress which has been enlarged.* Congress is authorized *to enforce* the prohibitions by appropriate legislation. Some legislation is contemplated to make the amendments fully effective. Whatever legislation is ap-

---

[8] But § 1 of the Fourteenth Amendment itself outlaws any state law which either as written or as applied discriminates against voters on account of race. Such a law can never be rational. "States may do a good deal of classifying that it is difficult to believe rational, but there are limits, and it is too clear for extended argument that color cannot be made the basis of a statutory classification affecting the right [to vote] set up in this case." *Nixon* v. *Herndon,* 273 U. S. 536, 541 (Holmes, J.).

propriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power." (Emphasis partially supplied.)

Thus § 5 of the Fourteenth Amendment in accordance with our constitutional structure of government authorizes the Congress to pass definitive legislation to protect Fourteenth Amendment rights which it has done many times, e. g., 42 U. S. C. § 1971 (a). For Congress to do this fits in precisely with the division of powers originally entrusted to the three branches of government—Executive, Legislative, and Judicial. But for us to undertake in the guise of constitutional interpretation to decide the constitutional policy question of this case amounts, in my judgment, to a plain exercise of power which the Constitution has denied us but has specifically granted to Congress. I cannot join in holding that the Virginia state poll tax law violates the Equal Protection Clause.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.

The final demise of state poll taxes, already totally proscribed by the Twenty-Fourth Amendment with respect to federal elections and abolished by the States themselves in all but four States with respect to state elections,[1] is perhaps in itself not of great moment. But the fact that the *coup de grace* has been administered by this Court instead of being left to the affected States or to the federal political process[2] should be a matter

---

[1] Alabama, Mississippi, Texas, and Virginia.

[2] In the Senate hearings leading to the passage of the Voting Rights Act of 1965, some doubt was expressed whether state poll taxes

of continuing concern to all interested in maintaining the proper role of this tribunal under our scheme of government.

I do not propose to retread ground covered in my dissents in *Reynolds* v. *Sims,* 377 U. S. 533, 589, and *Carrington* v. *Rash,* 380 U. S. 89, 97, and will proceed on the premise that the Equal Protection Clause of the Fourteenth Amendment now reaches both state apportionment (*Reynolds*) and voter-qualification (*Carrington*) cases. My disagreement with the present decision is that in holding the Virginia poll tax violative of the Equal Protection Clause the Court has departed from long-established standards governing the application of that clause.

The Equal Protection Clause prevents States from arbitrarily treating people differently under their laws. Whether any such differing treatment is to be deemed arbitrary depends on whether or not it reflects an appropriate differentiating classification among those affected; the clause has never been thought to require equal treatment of all persons despite differing circumstances. The test evolved by this Court for determining whether an asserted justifying classification exists is whether such a classification can be deemed to be founded on some rational and otherwise constitutionally permissible state policy. See, *e. g., Powell* v. *Pennsylvania,* 127 U. S. 678; *Barrett* v. *Indiana,* 229 U. S. 26; *Walters* v. *City of St. Louis,* 347 U. S. 231; *Baxstrom* v. *Herold, ante,* p. 107. This standard reduces to a minimum the likelihood that the federal judiciary will judge state policies in terms of the individual notions and predilections of its

___

could be validly abolished through the exercise of Congress' legislative power under § 5 of the Fourteenth Amendment. See Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 194–197 (1965). I intimate no view on that question.

own members, and until recently it has been followed in all kinds of "equal protection" cases.[3]

*Reynolds* v. *Sims, supra,* among its other breaks with the past, also marked a departure from these traditional and wise principles. Unless its "one man, one vote" thesis of state legislative apportionment is to be attributed to the unsupportable proposition that "Equal Protection" simply means indiscriminate equality, it seems inescapable that what *Reynolds* really reflected was but this Court's own views of how modern American representative government should be run. For it can hardly be thought that no other method of apportionment may be considered rational. See the dissenting opinion of

---

[3] I think the somewhat different application of the Equal Protection Clause to racial discrimination cases finds justification in the fact that insofar as that clause may embody a particular value in addition to rationality, the historical origins of the Civil War Amendments might attribute to racial equality this special status. See, *e. g., Yick Wo* v. *Hopkins,* 118 U. S. 356; *Shelley* v. *Kraemer,* 334 U. S. 1; *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410; *Brown* v. *Board of Education,* 347 U. S. 483; *Evans* v. *Newton,* 382 U. S. 296; cf. *Korematsu* v. *United States,* 323 U. S. 214, 216. See Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif. L. Rev. 341 (1949); Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv. L. Rev. 1, 33 (1959).

A similar characterization of indigency as a "neutral fact," irrelevant or suspect for purposes of legislative classification, has never been accepted by this Court. See *Edwards* v. *California,* 314 U. S. 160, 184–185 (Jackson, J., concurring). *Griffin* v. *Illinois,* 351 U. S. 12, requiring free trial transcripts for indigent appellants, and *Douglas* v. *California,* 372 U. S. 353, requiring the appointment of counsel for such appellants, cannot fairly be so interpreted for although reference was made indiscriminately to both equal protection and due process the analysis was cast primarily in terms of the latter.

More explicit attempts to infuse "Equal Protection" with specific values have been unavailing. See, *e. g., Patsone* v. *Pennsylvania,* 232 U. S. 138 (alienage); *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379 (sex); *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552, 564 (Rutledge, J., dissenting) (consanguinity).

STEWART, J., in *Lucas* v. *Forty-Fourth General Assembly of Colorado,* 377 U. S. 713, 744, and my own dissenting opinion in *Reynolds* v. *Sims, supra,* at pp. 615–624.

Following *Reynolds* the Court in *Carrington* v. *Rash,* 380 U. S. 89, applied the traditional equal protection standard in striking down a Texas statute disqualifying as voters in state elections certain members of the Armed Forces of the United States.[4]   But today in holding unconstitutional state poll taxes and property qualifications for voting and *pro tanto* overruling *Breedlove* v. *Suttles,* 302 U. S. 277, and *Butler* v. *Thompson,* 341 U. S. 937, the Court reverts to the highly subjective judicial approach manifested by *Reynolds.*   In substance the Court's analysis of the equal protection issue goes no further than to say that the electoral franchise is "precious" and "fundamental," *ante,* p. 670, and to conclude that "[t]o introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor," *ante,* p. 668.   These are of course captivating phrases, but they are wholly inadequate to satisfy the standard governing adjudication of the equal protection issue: Is there a rational basis for Virginia's poll tax as a voting qualification?   I think the answer to that question is undoubtedly "yes."[5]

---

[4] So far as presently relevant, my dissent in that case rested not on disagreement with the equal protection standards employed by the Court but only on disagreement with their application in that instance.   380 U. S., at 99–101.

[5] I have no doubt that poll taxes that deny the right to vote on the basis of race or color violate the Fifteenth Amendment and can be struck down by this Court.   That question is presented to us in *Butts* v. *Harrison,* No. 655, the companion case decided today. The Virginia poll tax is on its face applicable to all citizens, and there was no allegation that it was discriminatorily enforced.   The District Court explicitly found "no racial discrimination . . . in its application as a condition to voting."   240 F. Supp. 270, 271. Appellant in *Butts, supra,* argued first, that the Virginia Constitu-

684

Property qualifications and poll taxes have been a traditional part of our political structure. In the Colonies the franchise was generally a restricted one.[6] Over the years these and other restrictions were gradually lifted, primarily because popular theories of political representation had changed.[7] Often restrictions were lifted only after wide public debate. The issue of woman suffrage, for example, raised questions of family relationships, of participation in public affairs, of the very nature of the type of society in which Americans wished to live; eventually a consensus was reached, which culminated in the Nineteenth Amendment no more than 45 years ago.

Similarly with property qualifications, it is only by fiat that it can be said, especially in the context of American history, that there can be no rational debate as to their advisability. Most of the early Colonies had them; many of the States have had them during much of their histories;[8] and, whether one agrees or not, arguments have been and still can be made in favor of them. For example, it is certainly a rational argument that pay-

---

tional Convention of 1902, which framed the poll-tax provision, was guided by a desire to reduce Negro suffrage, and second, that because of the generally lower economic standard of Negroes as contrasted with whites in Virginia the tax does in fact operate as a significant obstacle to voting by Negroes. The Court does not deal with this Fifteenth Amendment argument, and it suffices for me to say that on the record here I do not believe that the factors alluded to are sufficient to invalidate this $1.50 tax whether under the Fourteenth or Fifteenth Amendment.

[6] See generally Ogden, The Poll Tax in the South 2 (1958); 1 Thorpe, A Constitutional History of the American People, 1776–1850, at 92–98 (1898); Williamson, American Suffrage From Property to Democracy, 1760–1860, cc. 1–4 (1960).

[7] See Porter, A History of Suffrage in the United States 77–111 (1918); Thorpe, op. cit. supra, at 97, 401; Williamson, op. cit. supra, at 138–181.

[8] See generally Ogden, op. cit. supra; Porter, op. cit. supra.

ment of some minimal poll tax promotes civic responsibility, weeding out those who do not care enough about public affairs to pay $1.50 or thereabouts a year for the exercise of the franchise. It is also arguable, indeed it was probably accepted as sound political theory by a large percentage of Americans through most of our history, that people with some property have a deeper stake in community affairs, and are consequently more responsible, more educated, more knowledgeable, more worthy of confidence, than those without means, and that the community and Nation would be better managed if the franchise were restricted to such citizens.[9] Nondiscriminatory and fairly applied literacy tests, upheld by this Court in *Lassiter* v. *Northampton Election Board,* 360 U. S. 45, find justification on very similar grounds.

These viewpoints, to be sure, ring hollow on most contemporary ears. Their lack of acceptance today is evidenced by the fact that nearly all of the States, left to their own devices, have eliminated property or poll-tax qualifications; by the cognate fact that Congress and three-quarters of the States quickly ratified the Twenty-Fourth Amendment; and by the fact that rules such as

---

[9] At the Constitutional Convention, for example, there was some sentiment to prescribe a freehold qualification for federal elections under Art. IV, § 1. The proposed amendment was defeated, in part because it was thought suffrage qualifications were best left to the States. See II Records of the Federal Convention 201–210 (Farrand ed. 1911). Madison's views were expressed as follows: "Whether the Constitutional qualification ought to be a freehold, would with him depend much on the probable reception such a change would meet with in States where the right was now exercised by every description of people. In several of the States a freehold was now the qualification. Viewing the subject in its merits alone, the freeholders of the Country would be the safest depositories of Republican liberty." *Id.,* at 203. See also Aristotle, Politics, Bks. III, IV; I Tocqueville, Democracy in America, c. xiii, at 199–202 (Knopf ed. 1948).

the "pauper exclusion" in Virginia law, Va. Const. § 23, Va. Code § 24–18, have never been enforced.[10]

Property and poll-tax qualifications, very simply, are not in accord with current egalitarian notions of how a modern democracy should be organized. It is of course entirely fitting that legislatures should modify the law to reflect such changes in popular attitudes. However, it is all wrong, in my view, for the Court to adopt the political doctrines popularly accepted at a particular moment of our history and to declare all others to be irrational and invidious, barring them from the range of choice by reasonably minded people acting through the political process. It was not too long ago that Mr. Justice Holmes felt impelled to remind the Court that the Due Process Clause of the Fourteenth Amendment does not enact the *laissez-faire* theory of society, *Lochner* v. *New York,* 198 U. S. 45, 75–76. The times have changed, and perhaps it is appropriate to observe that neither does the Equal Protection Clause of that Amendment rigidly impose upon America an ideology of unrestrained egalitarianism.[11]

I would affirm the decision of the District Court.

---

[10] See *Harper* v. *Virginia State Board of Elections,* 240 F. Supp. 270, 271.

[11] Justice Holmes' admonition is particularly appropriate: "Some of these laws embody convictions or prejudices which judges are likely to share. Some may not. But a constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or of *laissez faire.* It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States." 198 U. S., at 75–76.