COMMON CAUSE SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE OF GREATER LOS ANGELES, Common Cause Southern Christian Leadership Conference of Greater Los Angeles, Southwest Voter Registration Education Project, Chicano Federation of San Diego County, American Federation of Labor and Congress of Industrial Organizations, Bryan Cahn, Miguel Contreras, Laura Ho, Rev. Norman Johnson, Joanne McKray, Trisha Murakawa, Thomas Rankin, Bob Richards, Plaintiffs,

v.

Bill JONES, California Secretary of State, Defendant.

No. 01–CV–3470.

United States District Court, C.D. California, Western Division.

Aug. 24, 2001.

Stephen M. Kristovich, Bradley S. Phillips, Munger Tolles & Olson, Los Angeles, CA, John C. Ulin, Heller Ehrman White & McAuliffe, Los Angeles, CA, Mark D. Rosenbaum, Daniel P. Tokaji, ACLU Foundation of Southern California, Los Angeles, CA, Evan H. Caminker, Munger Tolles & Olson, San Francisco, CA, for Plaintiffs.

Daniel George Stone, Louis R. Mauro, CAAG—Office of Attorney General of California, Correctional Law Section, Sacramento, CA, Douglas J. Woods, CAAG Office of Attorney General of California, Sacramento, CA, for Defendant.

### ORDER DENYING MOTION FOR JUDGMENT ON THE PLEADINGS

WILSON, District Judge.

## I. Background

Under Cal.Gov.Code § 12172.5, Cal. Elec.Code §§ 19100, & 19201, the Secretary of State of California has the power to publish a list of voting systems from which counties may choose. Currently this list includes a punch card system as well as other, according to plaintiffs, more reliable voting systems.

Plaintiffs allege that, because punch card voting systems are less reliable than the other voting systems permitted by the secretary of state, those individuals living in counties where the punch-card system is used are substantially less likely to have their votes counted. This, plaintiffs allege, amounts to vote denial and a violation of the fundamental right to vote protected by the Fourteenth Amendment. Moreover, plaintiffs allege that the counties which

choose the punch-card system have high racial minority populations in comparison with counties using other voting systems. Therefore, plaintiffs allege that there is denial of the right to vote on the basis of race in violation of the Voting Rights Act, 42 U.S.C. § 1983.

## II. Analysis

### A. Standard

■ A motion for judgment on the pleadings under FedRule of Civil Proc. 12(c) is granted when assuming all the facts in the complaint to be true, the moving party is entitled to judgment as a matter of law. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1550 (9th Cir.1989). Defendant has brought this FRCP 12(c) motion.

### B. Proper Defendant

■ One of the defendant's primary arguments is that the secretary of state is not the proper defendant because individual counties select their respective voting systems. Defendant then cites numerous cases with suits against counties under the Voting Rights Act for redistricting which he claims supports his position that counties are the only proper defendant.

Plaintiff's choice of the secretary of state as a defendant is appropriate. Plaintiff claims that the denial of the right to vote arises from the collective choices of voting system by various counties. No choice by any single county is the source of the problem. Hence the only way to address the issue is to change the provision which allows counties to choose voting systems of widely disparate quality. The Secretary of State is the individual with the authority to make this change. Cal.Gov.Code § 12172.5, Cal.Elec.Code §§ 19100, & 19201. The Plaintiffs ask for an injunction requiring the defendant to make this change.

### C. Deprivation of the Fundamental Right to Vote in Violation of the Fourteenth Amendment

In defendant's first submission in support of this motion, defendant argued that plaintiffs had not alleged intent to discriminate on the basis of race. Plaintiffs correctly point out that they have sued not on the basis of racial discrimination that violates the Equal Protection Clause but for abridgement of the fundamental right to vote. The United States Supreme Court has clearly stated that the right to vote is a fundamental right protected by the Fourteenth Amendment. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 561–62, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.") The Supreme Court, however, has not clearly articulated the level of scrutiny which courts are to give to alleged infringements of the fundamental right to vote.

There are five Supreme Court opinions which discuss the standard to be applied in fundamental right to vote cases: *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Harper v. Virginia Board of Elections et al,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); and *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

*Reynolds* was an early legislative apportionment case. It held that legislative apportionment must be based on population but that states or counties need not achieve mathematical exactness in the correlation of representatives to population. *Reynolds* required that "any alleged infringement of the right of citizens to vote must be carefully and meticulously scruti-

nized." 377 U.S. at 562, 84 S.Ct. 1362. It did however provide for "reasonable" deviations from the population link "[s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy." *Id.* at 579, 84 S.Ct. 1362. Thus, at some times *Reynolds* seems to be adopting a strict scrutiny standard while at other the standard seems to be more lenient. One possible explanation for the tolerance for the divergences is that mathematical exactness in apportionment is difficult to achieve as a practical matter and therefore divergences are more tolerable that other forms of denial of the right to vote.

*Harper* concerned a Virginia poll tax and clearly adopted a strict scrutiny standard: "We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." *Harper,* 383 U.S. at 670, 86 S.Ct. 1079.

*Anderson* involved a claim that an Ohio early filing deadline, which prevented independent candidate Anderson from being placed on the ballot, denied Anderson's supporters the right to vote. There the court looked to whether or not important and legitimate state interests justified the burden imposed on the right to vote. 460 U.S. at 796, 103 S.Ct. 1564. The Court found that "the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id.* at 788, 103 S.Ct. 1564. Nonetheless, the Court struck down Ohio's early filing deadline.

*Burdick* concerned a Hawaii provision prohibiting write-in voting and explicitly rejected a strict scrutiny standard: "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compel-

ling state interest, . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." 504 U.S. at 433, 112 S.Ct. 2059. Instead, *Burdick* called for a flexible test. The first part of the test would determine the "character and magnitude" of the burden on the right to vote. Severe restrictions must be narrowly tailored to advance a state interest of compelling importance. If, on the other hand, the restrictions are reasonable and nondiscriminatory, the State's important regulatory interests will generally justify them. *Id.* at 434, 112 S.Ct. 2059.

*Bush* concerned the Florida ballot recounts in the 2000 Presidential election. The Court did not articulate a standard of review in this case. It merely said that a State may not value one person's right to vote over another via "arbitrary and disparate treatment." 531 U.S. at 104–05, 121 S.Ct. 525. While this language connotes a more lenient test akin to rational basis, the Court cited to *Harper* and *Reynolds* when discussing this standard. Though *Reynolds* does not provide a clear standard, *Harper* adopts a standard of at least intermediate, and possible, strict scrutiny. Thus, it appears that perhaps the Court was using a heightened standard of scrutiny but also was finding the Florida recounts to be arbitrary and discriminatory.

Notably, regardless of the standard of review used, all of the above cases save *Burdick* struck down the challenged practice or procedures.

■ Even if the more lenient standard is ultimately applied by this Court, Plaintiff has alleged facts indicating that the Secretary of State's permission to counties to adopt either punch-card voting procedures or more reliable voting procedures is unreasonable and discriminatory. Accordingly, the motion for judgment on the pleadings is denied. The parties may test

their arguments regarding the evidentiary support for this allegation on summary judgment. The parties should also address the legal issue of the standard of review in light of the discussion above at the time of summary judgment.

### D. Elements of the Voting Rights Act Case

Defendant argues that Plaintiffs have not alleged the necessary components of a Voting Rights Act case. Defendant argues that Plaintiff must satisfy the three part test articulated in *Thornburg v. Gingles,* 478 U.S. 30, 48–51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986): 1) the minority group is "sufficiently large and geographically compact to constitute a majority in single-member district"; 2) the minority group is "politically cohesive"; and 3) "the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate."

This test however seems to apply to redistricting and vote dilution cases. It is inapposite in the context of a straight vote denial case where either individuals of a certain race are explicitly denied the right to vote or voting qualifications disproportionately disqualify individuals of a certain race from voting.

█ The argument in the present case is that racial minorities are disproportionately denied the right to vote because their votes are uncounted in disproportionate numbers as a result of the voting mechanism that they are supplied. The voting mechanism challenge is far more similar to a voting qualification challenge than it is to redrawing the lines of voting districts. Accordingly, the *Thornburg* test will not apply to this case unless defendant is able to produce evidence to controvert this finding on summary judgment.

Defendant's motion for judgment on the pleadings is DENIED.

IT IS SO ORDERED.