TALLMAN, Circuit Judge,
dissenting:
There are certain times when a federal court may tell a municipality how to run its local elections. This is not one of them. Tucson’s hybrid election system does not invidiously discriminate against voters based on their race, ethnicity, gender, or wealth. Rather, plaintiffs argue — and the majority agrees — that Tucson unconstitutionally denies its citizens the right to vote by setting different geographical units for its couneilmanic primary and general elections. Because I conclude that the Constitution does not require Tucson to draw its district borders in a particular way for different local elections, I respectfully dissent.
I
“The Constitution grants States broad power to prescribe the ‘Times, Places and Manner of holding Elections for Senators and Representatives,’ Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices.” Clingman v. Beaver, 544 U.S. 581, 586, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005). The United States Supreme Court has recognized that government “is the science of experiment” and that states are “afforded wide leeway when experimenting with the appropriate allocation of state legislative power.” Holt v. City of Tuscaloosa, 439 U.S. 60, 71, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978) (citing Anderson v. Dunn, 19 U.S. 204, 6 Wheat. 204, 226, 5 L.Ed. 242 (1821)). However, a state’s power over its electoral procedures is not absolute and “must pass muster against the charges of discrimination or of abridgment of the right to vote.” Moore v. Ogilvie, 394 U.S. 814, 818, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).
A
Conspicuously absent from the majority’s opinion is any mention of the appropriate standard of review. In Burdick v. Takushi 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the Supreme Court announced the standard for evaluating laws respecting the right to vote. Although we typically invoke strict scrutiny to evaluate state laws that implicate fundamental rights, Burdick requires courts to apply a more deferential level of scrutiny to most state election laws that abridge the fundamental right to vote. Id. at 433, 112 S.Ct. 2059; Dudum v. Arntz, 640 F.3d 1098, 1113 (9th Cir.2011) (recognizing that Burdick creates a sliding scale standard of review). Courts determine the appropriate level of scrutiny to evaluate a state election law by examining the burden the law imposes on voters’ rights and then weighing that burden against the state’s legitimate interest in maintaining the law. *884 Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (citing Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)); Lauren Watts, Reexamining Crawford: Poll Worker Error as a Burden on Voters, 89 Wash. L.Rev. 175, 180 (2014) (discussing the Anderson/Burdick framework).
“Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.” Burdick, 504 U.S. at 434, 112 S.Ct. 2059. Strict scrutiny review is appropriate only if the burdens are severe; otherwise, the state election law is'constitutional so long as it is justified by a state’s “important regulatory interests.” Id.
B
The Supreme Court has been reticent to apply strict scrutiny to state election laws: It has done so only to evaluate discriminatory poll taxes, property ownership requirements for voting, and durational residency requirements. See Harper v. Va. State Bd. of Elections, 383 U.S. 663, 665-70, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (invalidating state poll tax); Kramer v. Union Free Sch. Dist., 395 U.S. 621, 632-33, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (holding that a state law requiring school district voters to own real property was unconstitutional); Dunn v. Blumstein, 405 U.S. 330, 335, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (states must show a “substantial and compelling reason” for imposing dura-tional residency requirements). But, the Supreme Court has applied a lesser burden when evaluating the constitutionality of literacy tests, felon disenfranchisement laws, and voter identification laws. See Lassiter v. Northampton Cty. Bd. of Elections, 360 U.S. 45, 50, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959) (upholding state statute that conditioned voting eligibility on ability to read and write any section of the Constitution); Richardson v. Ramirez, 418 U.S. 24, 56, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (upholding the ability of states to disenfranchise felons); Crawford v. Marion Cty., 553 U.S. 181, 202, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (upholding constitutionality of state law requiring voter identification). In other words, the Supreme Court counsels us to approach the constitutionality of state election laws through a deferential lens. See Burdick, 504 U.S. at 433, 112 S.Ct. 2059 (“Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections.”).
Applying Burdick’s sliding scale of constitutional scrutiny, we have “repeatedly upheld as ‘not severe’ restrictions that are generally applicable, even-handed, politically neutral, and protect the reliability and integrity of the election process.” Dudum, 640 F.3d at 1106 (citation omitted). Indeed, we have said that “voting regulations are rarely subjected to strict scrutiny,” and we are particularly loathe to strike down as unconstitutional an entire election system. Id. at 1106, 1114.
II
The majority concludes that Tucson’s hybrid election system for electing its city council violates the “one person, one vote” principle announced in Gray v. Sanders, 372 U.S. 368, 380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). According to the majority, Tucson’s system violates equal protection principles by designating different geographical units for its primary and general elections. The practical effect of the majority’s decision today is the total eradication of Tucson’s voting system, which has been in place since 1930. Tucson is now forced to choose between an entirely *885 at-large method of election or a ward-only method of election despite the fact that a majority of Tucson citizens have twice before voted against adopting these election systems. The Constitution does not require this sort of judicial highjacking of state power. Accordingly, I conclude that Tucson’s hybrid election system is constitutional. Several principles inform this conclusion.
A
Constitutional standards must be satisfied in primary as well as in general elections. Smith v. Allwright, 321 U.S. 649, 661-62, 64 S.Ct. 757, 88 L.Ed. 987 (1944). However, individuals do not have an absolute right to vote in a primary election. States may, for example, host a “closed” or “semielosed” primary, in which only people who are registered members of a major political party may vote. See Clingman, 544 U.S. at 584, 125 S.Ct. 2029; Nader v. Schaffer, 417 F.Supp. 837, 850 (D.Conn.1976), aff'd mem., 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602; see also Am. Party of Texas v. White, 415 U.S. 767, 786, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) (holding that states may establish waiting periods before voters may be permitted to change their registration and participate in another party’s primary). In other words, the Constitution permits states to prohibit qualified individuals who are registered Independents (or who chose not to register as a party member) from voting in a primary election.
In fact, we have upheld Arizona’s “closed primary” system in the face of a Fourteenth Amendment challenge similar to Plaintiffs’ challenge here. In Ziskis v. Symington, an independent voter “could not vote in the Arizona state primary election ... because [Arizona law] denies any voter not affiliated with a political party the opportunity to vote in that party’s primary.” 47 F.3d 1004, 1004-05 (9th Cir.1995). Ziskis sued the state in federal district court alleging that the law violated his Fourteenth Amendment right to vote. Id. at 1005. On appeal, we ruled in favor of the state. We held that the law did not overly burden Ziskis’s right to vote because Ziskis could access the ballot by associating with a political party, and if Ziskis chose not to register, “his right to vote in the general election is unaffected.” Id. at 1006. The Third Circuit recently resolved a similar Fourteenth Amendment challenge to New Jersey’s closed primary system. See Balsam v. Sec’y of N.J., 607 Fed.Appx. 177, 180-81 (3d Cir.2015). The court reasoned that voters do not “have a constitutional right to unqualified participation in primary elections,” and the burden the closed primary system placed on plaintiffs rights was minor compared to the state’s interests. Id. at 181-83.
While Ziskis and Balsam do not resolve the exact constitutional question presented here, they do counsel that primary and general elections are not on the same constitutional footing. See 26 Am. Jur.2d Elections § 223 (“A primary election is one that results in nominations rather than final elections to office. Thus, a primary election serves a different function from a general election, in that it is a competition for the party’s nomination, no more, no less, and does not elect a person to office but merely determines the candidate who will run for the office in the general election.”). Primary elections in Tucson are, in short, nothing more than the means political groups use to choose the standard bearers who will face off in the general election.
B
The majority finds it to be “perfectly clear” that Tucson’s primary and general elections are not independent and “must *886 be considered in tandem when determining their constitutionality.” Yet, the eases the majority cites do not establish that primary and general elections must always be considered together. For instance, United States v. Classic, was an election fraud case where the federal government prosecuted certain state election commissioners for allegedly falsifying ballots in a Democratic primary. 313 U.S. 299, 307-08, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). Classic held that the Constitution secures the right to have one’s “vote counted in both the general election and in the primary election.” Id. at 322, 61 S.Ct. 1031; see also Smith, 321 U.S. at 664-65, 64 S.Ct. 757 (holding that a political party may not create a “whites only” primary). However, Classic explained that the right it recognized only applied to voters who were “qualified” to cast votes in the state’s Democratic primary. 313 U.S. at 315, 61 S.Ct. 1031. Notably, Classic did not decide who was “qualified” to vote in the Democratic primary and left that distinction up to the state. See id. at 310-11, 61 S.Ct. 1031.
Classic teaches us that Tucson cannot deprive a “qualified” voter from voting in a ward primary. However, Tucson retains broad discretion to decide who is “qualified” to vote in its primaries. Thus, Classic does not preclude Tucson from setting up ward-based primaries whose “qualified” voters are limited to the residents of that particular ward.
The majority cautions that “if the city were permitted to change the geographical unit between the primary and general elections, it could decouple the representative to be elected from his constituency.” The majority creates two hypotheticals to illustrate its point: First, Tucson could decree that only voters living on Main Street are eligible to vote in primaries. Second, the State of New York could limit the primary for its junior senator to Manhattanites and the primary for its senior senator to the rest of the state.
But, an application of Burdick’s sliding scale of constitutional scrutiny reveals that neither of the majority’s fictional state election systems would pass constitutional muster. First, both of these hypotheticals eliminate large swaths of city residents from voting in any primary, which would likely be considered a “severe burden” on voting rights and subject to strict scrutiny under Burdick. And second, the states would have an extremely difficult time articulating any sort of legitimate state interest in defense of these election systems. Unlike the majority’s hypothetical state election laws, Tucson’s hybrid system gives each citizen the right to vote in her respective ward primary, and Tucson has articulated an “important regulatory interest” to support its hybrid system.
C
Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), is not as favorable to the majority’s position as it assumes. Gray held that states cannot construct election schemes so that one person’s vote is weighed more heavily than another person’s vote. Id. at 380-81, 83 S.Ct. 801. And, let there be no doubt about this — “[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote.” Id. at 379, 83 S.Ct. 801. However, the Supreme Court has never before held that the same geographical unit must apply to both the primary and general elections.
In asserting the contrary, the majority misreads Gray and views the case in a vacuum. Since Gray, the law on “one person, one vote” has dealt almost exclusively with congressional redistricting and *887 malapportionment, see, e.g., Reynolds v. Sims, 377 U.S. 533, 557, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), principles that are not at issue here. And, the Supreme Court has squarely rejected the notion that an individual has a right to vote in any election that might impact her life and livelihood. See Holt, 439 U.S. at 69, 99 S.Ct. 383 (“No decision of this Court has extended the ‘one man, one vote’ principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions.”).
Gray does not deprive states of their broad authority to set the geographical unit from which a representative is to be elected. See Holt, 439 U.S. at 68-69, 99 S.Ct. 383 (holding that city need not extend the franchise to the citizens of bordering municipalities, even though those citizens are subject to the city’s criminal law jurisdiction); see also Green v. City of Tucson, 340 F.3d 891, 893 (9th Cir.2003) (upholding Arizona’s annexation law that “draws geographical distinctions” between voters living in unincorporated communities); City of Herriman v. Bell, 590 F.3d 1176, 1185 (10th Cir.2010) (“[T]he state has the right to draw different boundaries for voting purposes — and we generally defer to these delineations — as long as the separate units further reasonable government objectives.”). Simply put, Gray does not reach as far as the majority might wish.
Ill
A
From this it follows that Tucson’s hybrid primary system does not “severely burden” the Plaintiffs’ right to vote. During Tucson’s primary election, the law ensures that each eligible voter within the relevant geographical unit — the ward — has an equal right to vote. The same holds true for the general election: Each eligible voter within the relevant geographical unit — the city^ — has an equal right to vote. Thus, the Plaintiffs are only entitled to vote in the primary election of the ward in which they reside. But, their right to vote in their ward primary is not burdened in any way. See Holt, 439 U.S. at 68-69, 99 S.Ct. 383.
The majority finds that “the practical effect of the Tucson system is to give some of a representative’s constituents — those in his home ward — a vote of disproportionate weight.” Not so. While a City Council member, once elected, is likely to be alert to the particular needs of his home ward, every single vote in Tucson’s elections are weighted the same. In fact, the hybrid system’s ability to foster attentiveness to local needs is precisely the reason it was created in the first place: the ward-based primary helps to ensure that each ward has a nominee for City Council who is aware of that ward’s particular needs.
B
When a state election law places no severe burden on voters’ rights, “a [sjtate’s important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.” Clingman, 544 U.S. at 593, 125 S.Ct. 2029. Tucson has a legitimate interest in ensuring geographic diversity on the City Council, and the hybrid system fairly advances this legitimate interest. Specifically, Defendants persuasively assert:
Having nominations through primary elections in each ward, using separate ballots for each party, allows the party electorates in each of those wards to make .their own choice of a nominee, and simultaneously acts as a guarantee for the City electorate as a whole that each ward’s nominee actually has support among the party members within that *888 ward. Moreover, since nominees compete .in the general election only against other candidates nominated in the same ward, see Compl. ¶ 24, ward nominations also help assure that each ward has a local representative on the council, and conversely, that the full Mayor and Council has members who are aware of each ward’s issues, problems, and views.... The principal and adequate reason for providing for the election of one councilman from each borough is to assure that there will be members of the City Council with some general knowledge of rural problems to the end that this heterogeneous city will be able to give some due consideration to questions presented throughout the entire area.
This important regulatory interest is sufficient to justify any burden the hybrid system places on Plaintiffs’ right to vote.
IV
Tucson’s hybrid system is constitutional, and the majority errs in holding otherwise. Supreme Court precedent teaches us that a municipality has broad authority to establish the relevant geographical units for its elections. See Holt, 439 U.S. at 68-69, 99 S.Ct. 383. Furthermore, the majority points to no case that requires a municipality to use the same geographical unit for both its primary and general elections, cf. Gray, 372 U.S. at 381, 83 S.Ct. 801, and the majority’s holding to the contrary stretches the “one person, one vote” principle beyond its traditional application. Finally, because primary and general elections are not constitutionally equal, see Balsam, 607 Fed.Appx. at 180-81, state laws may narrow the franchise in a primary election without running afoul of the Fourteenth Amendment, see Ziskis, 47 F.3d at 1005-06. See also N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 206, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008) (permitting nomination by party convention). In short, the Constitution permits Tucson to set different geographical units for its primary and general elections.
I respectfully dissent.