Edythe F. TUCKER, Plaintiff,

v.

Joseph M. BURTON, Clerk D. C. Court
of General Sessions

and

Household Finance Corporation of
Suitland, Defendants.

Civ. A. No. 1341–70.

United States District Court,
District of Columbia.

Nov. 12, 1970.

C. Boyden Gray, Washington, D. C.,
with whom Max O. Truitt, Jr., Washington, D. C., was on the brief for plaintiff.

Harry Protas, Chevy Chase, Md., for
Household Finance Corp. of Suitland.

John C. Salyer, Asst. Corp. Counsel,
Washington, D. C., for defendant Joseph
M. Burton.

Before WRIGHT and TAMM, Circuit
Judges, and HART, District Judge.

## OPINION

HART, District Judge:

On or about August 14 1969, defendant, Household Finance Corporation, a
Maryland corporation, filed a complaint
against the plaintiff, a Maryland resident, to recover the balance allegedly due
the defendant on an Installment Sale
Agreement contracted in the District of
Columbia and guaranteed by Tucker,

(GS 15536–69). The complaint alleged the Agreement had been entered into May 5, 1968, between Brown's Furniture Center, Inc., as seller, and Tucker, as guarantor, and that Household was the assignee of that Agreement from Brown's. (Household admits that the contract in its hands is subject to all defenses that Brown's would have been subject to.) In the complaint Tucker's address was given as 2503 Southern Avenue, S. E., Apt. 204, Washington, D. C. On August 14, 1969, a summons was issued to the plaintiff at the above address. On August 28, 1969, the summons was returned unserved with the notation that the address given was in Maryland.

On September 17, 1969, an amended complaint, supported by affidavit, was filed by Household which additionally alleged that Tucker was a non-resident of the District of Columbia, an allegation not contained in the original complaint. On the same date, a $1,000 bond, with approved surety was filed by Household. An alias summons was issued on the amended complaint with the address changed to 2503 Southern Avenue, Apt. 204, District Heights, Maryland. On October 13, 1969, the alias summons was returned unserved because of the Maryland address.

On October 31, 1969, Household sued out a writ of prejudgment attachment against Government Services, Inc., attaching the wages of Tucker, pursuant to § 16–501 et seq., D.C.Code, 1967. The writ was issued by Joseph .M. Burton in his capacity as Clerk of the District of Columbia Court of General Sessions, Civil Division, pursuant to the filing of the amended complaint accompanied by an affidavit in accordance with the statutory requirements of the above-mentioned provision: (1) Showing the grounds of plaintiff's claim, (2) Setting forth that plaintiff had a just right to recover what was claimed in his complaint; (3) Setting out the alleged breach of contract and the damages resulting therefrom; and (4) Stating that defendant was a non-resident of the District of Columbia.

On November 24, 1969, Tucker filed a motion in the Court of General Sessions to quash the writ of attachment before judgment on the sole ground that she had not been served notice of the action and given an opportunity to defend same prior to the attachment. The motion to quash was not supported by affidavit. Points and Authorities in opposition to Tucker's motion to quash was filed November 26, 1969. The motion was denied December 1, 1969. On December 16, 1969, Tucker was served with the amended complaint and affidavits at 17th and New York Avenue, N. W., Washington, D. C., by a Special Process Server appointed by the Court. On January 9, 1970, Tucker answered the amended complaint and was allowed to proceed in Forma Pauperis. On January 12, 1970, the Court of General Sessions case was put on the "Ready for Trial Calendar."

At no time has Tucker filed a traversing affidavit in the Court of General Sessions under the provisions of § 16–506, D.C.Code (1967). At no time has Tucker moved to advance her case for hearing in the Court of General Sessions.

On May 1, 1970, Edythe F. Tucker filed in this Court a Verified Complaint for Declaratory Relief and Preliminary and Permanent Injunction against Joseph M. Burton, Clerk of the District of Columbia Court of General Sessions. In her complaint, Tucker prayed that § 16–501 et seq., D.C.Code (1967), be declared unconstitutional under the Fifth Amendment as applied to non-resident wage earners in the District of Columbia, and for injunctive relief. Since the complaint sought to declare an Act of Congress unconstitutional, a three-judge court was applied for and granted pursuant to 28 U.S.C.A. §§ 2282, 2284. At a hearing before the three-judge court on June 8, 1970, it appeared that Household Finance Corp. of Suitland was an indispensable party, and not having been named in the complaint, Tucker was given 20 days to amend the complaint and bring in Household as a party-defendant.

Tucker was also directed to file a motion for Summary Judgment forthwith since it appeared that there would be no dispute as to any material fact in the case. An amended complaint was filed, bringing in Household, and the Motion for Summary Judgment by Tucker was filed.

Defendant Joseph M. Burton moved to dismiss and defendant Household moved for Summary Judgment. Oppositions were filed to all motions.

On October 12, 1970, a hearing was had before the three-judge court on plaintiff's Motion for Summary Judgment, defendant Burton's Motion to Dismiss and Household's Motion for Summary Judgment.

Plaintiff contends that § 16–501 et seq., D.C.Code (1967) in its provisions for attachment before judgment is unconstitutional as it applies to a non-resident of the District of Columbia who is employed as a wage-earner in the District of Columbia. Plaintiff says that the statute, if so applied, would deprive her of property without due process of law, thus violating the Fifth Amendment.

Plaintiff places strong reliance on Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) to support her position.

In Sniadach v. Family Finance, *supra,* a creditor filed a complaint in the Wisconsin Courts against a Wisconsin resident employed in Wisconsin. The creditor attached the wage-earner's wages before judgment. The wage-earner attacked the attachment as violative of the due process requirements of the Fourteenth Amendment.

The Supreme Court explained the operation of the Wisconsin attachment as follows:

"* * * What happens in Wisconsin is that the clerk of the court issues the summons at the request of the creditor's lawyer; and it is the latter who by serving the garnishee sets in motion the machinery whereby the wages are frozen. They may, it

is true, be unfrozen if the trial of the main suit is ever had and the wage earner wins on the merits. But in the interim the wage earner is deprived of his enjoyment of earned wages without any opportunity to be heard and to tender any defense he may have, whether it be fraud or otherwise."

The Supreme Court then went on to say:

"Such summary procedure may well meet the requirements of due process in extraordinary situations. Cf. Fahey v. Mallonee, 332 U.S. 245, 253–254, 67 S.Ct. 1552, 1554–1556, 91 L.Ed 2030; Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 598–600, 70 S.Ct. 870, 872–873, 94 L.Ed. 1088; Ownbey v. Morgan, 256 U.S. 94, 110–112, 41 S.Ct. 433, 437–438, 65 L.Ed. 837; Coffin Bros. v. Bennett, 277 U. S. 29, 31, 48 S.Ct. 422, 423, 72 L.Ed. 768. But in the present case no situation requiring special protection to a state or creditor interest is presented by the facts; nor is the Wisconsin statute narrowly drawn to meet any such unusual condition. Petitioner was a resident of this Wisconsin community and *in personam* jurisdiction was readily obtainable. * * *"

The Supreme Court then held the Wisconsin statute, as applied to a resident debtor, not to be a statute narrowly drawn to meet an unusual condition and declared the statute violative of the due process provisions of the Fourteenth Amendment as it applied to a wage earner who was also a Wisconsin resident.

In the case at bar the wage earner whose wages are attached is a non-resident in the jurisdiction issuing the attachment. This is within the meaning of an "unusual condition" as these words were used by the Supreme Court in Sniadach v. Family Finance Corp. This is a condition that the Congress has seen fit to consider "unusual" to the extent of requiring special protection to a creditor since *at least* 1901 (See 1901 Code, § 445 et seq.)

With the "unusual condition" established, we examine § 16–501 et seq., D. C.Code (1967) to see whether or not, under Sniadach v. Family Finance Corp., the statute is so narrowly drawn as to meet the requirements of due process as to notice to the debtor and opportunity to be heard on all aspects of the claim on which the attachment before judgment is based.

§ 16–501, D.C.Code (1967), as it applies to the instant case, provides:

"(a) This section applies to any civil action in the * * * District of Columbia Court of General Sessions, for the recovery of:

* * * * * *

"(2) a debt; or

* * * * * *

"(b) In an action specified by subsection (a) of this section, the plaintiff, his agent, or attorney, may file an affidavit as provided by subsections (c) and (d) of this section either at the commencement of the action or pending the action.

"(c) The affidavits shall comply with the following requirements:

(1) show the grounds of plaintiff's claim;

(2) set forth that plaintiff has a just right to recover what is claimed in his complaint;

* * * * * *

(5) where the action is to recover damages for breach of a contract set out, specifically and in detail, the breach complained of and the actual damage resulting therefrom.

"(d) The affidavit shall also state one of the following facts with respect to defendant:

"(1) Defendant * * * is not a resident of the District, * * *;

* * * * * *

"(e) Before a writ of attachment and garnishment is issued, the plaintiff shall first file in the clerk's office a bond, executed by himself or his agent, with security to be approved by the clerk, in twice the amount of his claim, conditioned to make good to the defendant all costs and damages which he may sustain by reason of the wrongful suing out of the attachment; * * *

"(f) If the plaintiff files an affidavit and bond as provided by this section, the clerk shall issue a writ of attachment and garnishment, to be levied upon as much of the lands, tenements, goods, chattels, and credits of the defendant as may be necessary to satisfy the claim of the plaintiff."

§ 16–502, D.C.Code (1967) provides for notice as follows:

"(a) A writ issued pursuant to section 16–501 shall require the marshal to serve a notice on the defendant, if he is found in the District, and on any person in whose possession any property or credits of the defendant may be attached, to appear in the court on or before the twentieth day, exclusive of Sundays and legal holidays, after service of the notice, and show cause, if any there be, why the property so attached should not be condemned and execution thereof had. The marshal's return shall show the fact of the service.

"(b) If the defendant is returned 'Not to be found,' the notice shall be given by publication * * *."

§ 16–505, D.C.Code (1967), gives to the defendant or any other person interested in the proceedings who is not satisfied with the sufficiency of the surety or with the amount of the penalty named in the bond the right to apply to the Court for an order requiring plaintiff to post additional bond with surety approved by the Court.

§ 16–506, D.C.Code (1967) provides:

"If the defendant files affidavits traversing the affidavits filed by the plaintiff the court shall determine whether the facts set forth in the plaintiff's affidavits as ground for issuing the attachment are true, and whether there was just ground for issuing the attachment. When, in the

opinion of the court, the proofs do not sustain the affidavit of the plaintiff, his agent, or attorney, the court shall quash the writ of attachment. This issue may be tried by the court or a judge at chambers after three days' notice. The issue may be tried as well upon oral testimony as upon affidavits. If the court deems it expedient, a jury may be impaneled to try the issue."

This Court interprets § 16–506, D.C. Code (1967) as meaning exactly what it so clearly says, that is, a non-resident wage earner whose wages have been attached before judgment may file affidavits traversing the affidavits filed by plaintiff. We interpret the statute to read that defendant may in his affidavit traverse any matter contained in plaintiff's affidavit, including but not limited to, the ground of plaintiff's action, whether plaintifif has a just right to recover what is claimed in the complaint, whether the contract was breached and the damages resulting therefrom, if any, and whether the defendant is a non-resident of the District. In the case at bar the statute (§ 16–501, D.C.Code (1967) required plaintiff Household to set forth in its affidavit supporting the attachment each of the above points and § 16–506 D.C.Code (1967) says plaintiff's affidavit may be traversed by debtor. The statute does not by words or by implication limit the matters in the attaching plaintiff's affidavit which the defendant debtor may traverse.

■ In the case at bar this Court interprets § 16–506 D.C.Code (1967) as permitting Mrs. Tucker in GS 15536–69 to traverse each of the following by affidavit:

1. The grounds of Household's claim;

2. Household's claim that it had a just right to recover the amount claimed in the complaint;

3. That the contract sued on had been breached and that damages had resulted therefrom;

4. That Tucker was not a resident of the District of Columbia.

As to notice to Tucker of the pendency of the action and of the attachment, Tucker's employer notified Tucker promptly upon the service of the attachment on the employer. This is a practice that may reasonably be expected of employers whose employees' wages are attached either before or after judgment.

Further § 16–502 D.C.Code (1967) requires that notice be served on the defendant if the defendant is found in the District and, if the defendant is returned "Not to be found," to publish against the defendant "at least once a week for three successive weeks or oftener, or for such further time and in such manner as the Court orders."

It thus appears that the realities of the situation plus the provisions of § 16–502, D.C.Code (1967) provide for notice to a defendant whose wages are attached before judgment in as expeditious a manner as is reasonably practical.

A defendant wage earner may traverse the attaching creditor's affidavit just as soon as the wage earner has knowledge of the attachment, which, in the case at bar, was almost immediately after the attachment was served on the employer.

When a defendant, by affidavit, traverses the creditor's affidavit, § 16–506, D.C.Code (1967) provides that the issue raised by the traverse may be tried by the Court or a Judge after three days notice. We interpret the provisions providing for a hearing on the issue raised by the traverse as requiring an expedited trial of the issue so raised at the expiration of the three days notice or very shortly thereafter, depending on the exigency of the situation.

§ 16–506, D.C.Code (1967) also provides that the issue raised by the traverse may be tried before a jury if the Court deems same to be expedient. We interpret this provision to give a Court reasonable discretion as to whether or not a jury will be empaneled to try the issue raised by the traverse, but, of course, this discretion cannot be abused. Where a jury trial is requested, this section would

require the granting of the request unless good cause to the contrary existed.

■ We hold that § 16–501 et seq., as it applies to a non-resident wage earner in the District of Columbia is a statute narrowly drawn to meet an unusual condition and is not violative of the due process clause of the Fifth Amendment to the Constitution of the United States.

Plaintiff's Motion for Summary Judgment is denied.

Defendant Burton's Motion to Dismiss is granted.

Defendant Household Finance Company's Motion for Summary Judgment is granted.

Counsel will present an appropriate order.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

This is a class action for declaratory and injunctive relief brought in the District Court against the clerk of the Civil Division of the District of Columbia Court of General Sessions and Household Finance Corporation of Suitland, Maryland. The plaintiff and those she represents are wage earners who reside outside of and are employed within the District of Columbia and who are therefore subject to the District's prejudgment garnishment provisions, 16 D.C.Code § 501 et seq. (1967). Defendant Household Finance Corporation has an action on an alleged breach of contract pending against plaintiff in the Court of General Sessions and has secured a writ of attachment before judgment currently outstanding against plaintiff's employer. Plaintiff contends that the District's prejudgment garnishment provisions are unconstitutional under the Fifth Amendment and Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). Her standing to challenge the District of Columbia provisions comes from the fact that under

their authority she has been deprived, and continues to be deprived, of a portion of her wages, pursuant to Household Finance's suit. Because the prejudgment garnishment provisions found unconstitutional in Sniadach differ from the District's provisions in several material respects, we must first understand the basis for and reach of the Sniadach holding before determining its application, if any, to this case.

In Sniadach, the Family Finance Corporation of Bay View, acting pursuant to a Wisconsin statute, filed with the clerk of the court a complaint in garnishment alleging a claim of $420 on a promissory note. The clerk then issued a garnishee summons, directing Mrs. Sniadach's employer to pay her only a statutory subsistence amount and to retain the remainder of the wages owed her until further order of the court. Mrs. Sniadach moved to dismiss these garnishment proceedings because notice and an opportunity to be heard were not given before the in rem seizure of her wages, in violation of due process requirements. The Supreme Court of Wisconsin rejected her argument, noting that Mrs. Sniadach had not lost legal title to her wages and finding that the temporary loss of the use of part of her regular wages was a de minimis inconvenience not reached by the Fourteenth Amendment. Family Finance Corp. of Bayview v. Sniadach, 37 Wis.2d 163, 154 N.W.2d 259 (1967). In an opinion by Mr. Justice Douglas, the United States Supreme Court, by a seven to one majority, reversed and held the Wisconsin statute unconstitutional.

It is, of course, generally accepted as fundamental to procedural due process that a person be afforded "notice and an opportunity to be heard" before he may be deprived of life, liberty or property. Although the Supreme Court has occasionally sustained a conditional prejudgment deprivation of a constitutionally protected right pending the outcome of the case, it has usually done so only in cases involving some compelling public

interest.[1] The respondents in *Sniadach* tried to make out such a public interest, arguing that the importance to the state of reliable debt collection by general creditors justified pretrial wage garnishment by summary process. But the Court focused instead upon the abuses of and hardship caused by wage garnishment and found that the damage to individual debtors in cases involving unjustifiable or fraudulent claims clearly outweighed any legitimate state interest in allowing creditors summary process.

Noting that wages are a "specialized type of property presenting distinct problems in our economic system," 395 U.S. at 340, 89 S.Ct. at 1822, the *Sniadach* Court described the evil effects of prejudgment garnishment as follows:

" * * * What happens in Wisconsin is that the clerk of the court issues the summons at the request of the creditor's lawyer; and it is the latter who by serving the garnishee sets in motion the machinery whereby the wages are frozen. They may, it is true, be unfrozen if the trial of the main suit is ever had and the wage earner wins on the merits. But in the interim the wage earner is deprived of his enjoyment of earned wages without any opportunity to be heard and to tender any defense he may have, whether it be fraud or otherwise.

\* \* \* \* \* \*

"Recent investigations of the problem have disclosed the grave injustices made possible by prejudgment garnishment whereby the sole opportunity to be heard comes after the taking. Congressman Sullivan, Chairman of the House Subcommittee on Consumer Affairs who held extensive hearings on this and related problems stated:

'What we know from our study of this problem is that in a vast number of cases the debt is a fraudulent one, saddled on a poor ignorant person who is trapped in any easy credit nightmare, in which he is charged double for something he could not pay for even if the proper price was called for, and then hounded into giving up his pound of flesh, and being fired besides.' 114 Cong.Rec. 1832.

"The leverage of the creditor on the wage earner is enormous. The creditor tenders not only the original debt but the 'collection fees' incurred by his attorneys in the garnishment proceedings:

'The debtor whose wages are tied up by a writ of garnishment, and who is usually in need of money, is in no position to resist demands for collection fees. If the debt is small, the debtor will be under considerable pressure to pay the debt and collection charges in order to get his wages back. If the debt is large, he will often sign a new contract of "payment schedule" which incorporates these additional charges.'

"Apart from those collateral consequences, it appears that in Wisconsin the statutory exemption granted the wage earner is 'generally insufficient to support the debtor for any one week.'

"The result is that a prejudgment garnishment of the Wisconsin type may as a practical matter drive a wage-earning family to the wall. Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing (cf. Coe v. Armour Fertilizer Works, 237 U.S. 413, 423 [35 S.Ct. 625, 628, 59 L.Ed. 1027] this prejudgment garnishment procedure

---

1. *See, e. g.,* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). As the lower court stated: "[T]he issue is not whether a specific termination was proper, but whether the procedures used were justifiable. * * * Suffice it to say that to cut off a welfare recipient in the face of * * * 'brutal need' without a prior hearing of some sort is unconscionable, unless overwhelming considerations justify it." Kelly v. Wyman, S.D.N.Y., 294 F.Supp. 893, 900 (1968).

violates the fundamental principles of due process."

2. Although recent federal legislation (82 Stat. 146, Act of May 29, 1968) forbids discharge of employees on grounds that their wages have been garnished, law review commentaries on the *Sniadach* opinion continue to stress the other pressures which prejudgment garnishment puts on the poor debtor and to muster an impressive array of evidence to counter the notion that such garnishment constitutes only a "minor" and "temporary" taking which *does not raise serious due process* problems. Thus, for example:

> "* * * Rather than lose his wage or, what is worse, the job that is his *sole means of supporting his family,* [the debtor] will accede to the creditor's demand for a new, more costly repayment schedule, or resort to personal bankruptcy. Thus, if a hearing does not occur before garnishment is allowed, it will probably never occur; and fraudulent claims will not be contested. The overwhelming factual probability that a pre-trial garnishment will not be subject to judicial scrutiny was demonstrated by a recent empirical study in Los Angeles County; 97 percent of the cases in which garnishment was used never went to trial. 'Temporary' seizures are in this manner changed to permanent takings without a judicial determination of the validity of the claim which is the basis of the taking."

17 U.C.L.A.L.Rev. 837, 840 (1970), citing Western Center on Law and Poverty, Impact and Extent of Wage Garnishment in Los Angeles County 39, 114 (1968). (Footnotes omitted.)

A study by a State of Washington district *court judge found that not one of the* 227 prejudgment garnishments filed during the study period actually went to trial. Patterson, Foreword: Wage Garnishment—An Extraordinary Remedy Run Amuck, 43 Wash.L.Rev. 735, 735–736, 738 & n. 7 (1968).

Besides attacking the notion that prejudgment garnishment entails only a temporary and *de minimis* taking not within the purview of the Fifth Amendment, the law review commentaries also criticize one of the basic rationales of garnishment— the assumption that it is necessary to protect the creditor's interests against debtors who will flee the jurisdiction of the court to escape its judgment. As one review states it:

> "Attachment is used primarily as a step in the collection process by retail merchants against wage-earning, low in-

395 U.S. at 338–342, 89 S.Ct. at 1821–1822. (Footnotes omitted.) [2]

come credit customers. Profiles of the average debtor subject to attachment indicate that he has lived in the same area for a long time and has a steady record of employment; payment on his obligations has generally lapsed because of illness, loss of work, pressure of other debts, or a belief in creditor fraud. Thus, available information indicates that these debtors are not the kind of people who are likely to attempt to *frustrate judgment on notice of suit.* Consequently, attachment should be unnecessary."

17 U.C.L.A.L.Rev. 837, 845–846 (1970). (Footnotes omitted.) According to one study, the average debtor attached has lived in the same city for over 20 years. Eighty per cent of such debtors attend church regularly. Nearly two thirds voted in the last presidential election, 61% of payment lapses were attributed to illness, loss of work or pressure of other debts; 16% were based on a belief in creditor fraud. Western Center on Law and Poverty, Impact and Extent of Wage Garnishment in Los Angeles County 11 (1968).

Finally, the reviews cast doubt on the oft discussed policy argument that to do away with prejudgment garnishment will hurt the poor rather than help them, because creditors will not lend money without this protection. Empirical studies have examined the effect which elimination of wage garnishment, both before and *after judgment, has on credit availability,* but not the effect which purely pretrial remedies have. Elimination of wage garnishment in Texas *apparently did affect credit adversely, while* restriction of garnishment through higher exemption in New York did not. *See* Brunn, Wage Garnishment in California: A Study and Recommendations, 53 Calif.L.Rev. 1214, 1239–1243 (1965) ; Comment, Wage Garnishment in Washington—An Empirical Study, 43 Wash.L.Rev. 743, 760–761 (1968).

> "There is also no reason to believe that attachment has any necessary effect on the availability of credit. Available credit would be restricted only if the creditor granted or denied a loan on the basis of the availability of attachment. But in the general consumer debt case, ultimate collectibility does not depend on attachment, but on execution levies. The law makes obtaining a judgment easy, and most collection suits are quickly reduced to judgment. Often no

Defendants argue that the holding of *Sniadach* is inapplicable to the facts of our case on two separate grounds: first, because the Wisconsin provisions permitted prejudgment garnishment of wages of *all* residents, while the challenged District provision applies only to *nonresidents*[3]; and second, because the Wisconsin provisions allowed garnishment pending outcome of the litigation without notice and opportunity to be heard, whereas the District statute entitles a debtor in a garnishment action to file affidavits traversing those of the plaintiff and to have the sufficiency of the plaintiff's justification tested in court shortly after attachment, with the possibility that the writ may be quashed.

Taking the second and less impressive of defendants' contentions first, it is clear that 16 D.C.Code § 506 does not satisfy the requirements of notice and prior hearing as defined in the majority and concurring opinions of *Sniadach*. Section 506 reads:

"If the defendant files affidavits traversing the affidavits filed by the plaintiff the court shall determine whether the facts set forth in the plaintiff's affidavits as ground for issuing the attachment are true, and whether there was just ground for issuing the attachment. When, in the opinion of the court, the proofs do not sustain the affidavit of the plaintiff, his agent, or attorney, the court shall quash the writ of attachment. This issue may be tried by the court or a judge at chambers after three days' notice. The issue may be tried as well upon oral testimony as upon affidavits. If the court deems it expedient, a jury may be impaneled to try the issue."

Although this language is sufficiently ambiguous on its face to be read as providing for notice and hearing which satisfy the requirements of *Sniadach*, the case law gloss on Section 506 proves the contrary. As stated in Morfessis v. Thomas, D.C.Mun.App., 91 A.2d 833, 836 (1952): "The defendant may deny by affidavit the specific grounds alleged by the plaintiff to entitle him to the attachment, e. g., if non-residence is alleged he may contradict it, as this applies solely to the remedy, not to the right of action. It is not permissible for the defendant, by a motion to quash an attachment, to show that the debt is not due or that the amount claimed by plaintiff is unconscionable or unreasonable; nor upon such a motion can the nature, validity, or justice of the cause of action sued on be inquired into. This would be to try in a summary and collateral way the main issue in the case."[4] Thus Section 506 clearly fails to meet the requirements of *Sniadach* because it provides for a hearing which comes *after* the attachment. Even then the hearing tests only procedural regularity. What *Sniadach* clearly requires is a hearing *before* the taking of wages which goes to the *merits* of the claimed debt.[5]

more than the statutory ten days elapse between summons and judgment. In addition, the stability of the average debtor makes him amenable to execution levy. Depriving the general creditor of the right to attach, absent special circumstances, thus takes from him a means of coercing payment, but it does not impair ultimate and speedy collectibility of a debt."
17 U.C.L.A.Rev. 837, 846 (1970). (Footnotes omitted.)

3. In this suit, plaintiff challenges only that part of the District provision which authorizes prejudgment garnishment for all nonresidents. The other situations in which the provision is designed to apply are more narrowly drawn and may well be the kind of "extraordinary situations" excepted from the holding of *Sniadach*— e. g., when the alleged debtor is a foreign corporation, or has been absent from the District for at least six months, or is evading service of process by concealment or withdrawal from the jurisdiction, or has or is about to dispose of or secrete his property with intent to evade ordinary process, or has contracted the debt or incurred the obligation fraudulently. 16 D.C.Code § 501(d) (1967).

4. Applied as holding in National Brick & Supply Co. v. Bradshaw, D.C.Mun. App., 91 A.2d 838 (1952).

5. *See, e. g.*, 83 Harv.L.Rev. 7, 115 (1969): "The *Sniadach* opinion was more an indignant response to an existing prac-

Although defendants' attempt to distinguish our case from *Sniadach* on the basis of the different kinds of hearings provided for by the relevant statutes can be easily rejected, their other contention, based on the nonresidency provision of the District statute, requires more rigorous analysis. While stating clearly that a full hearing on the merits before garnishment was required by the Fifth Amendment under the facts of *Sniadach*, the Supreme Court was careful to limit its holding to the specific controversy before it, and to note that "summary procedure may well meet the requirements of due process in extraordinary situations." 395 U.S. at 339, 89 S.Ct. at 1821. Once it is decided that the District provision for a hearing upon a traverse of affidavits does not meet the standards for a proper hearing required by the Supreme Court for a *Sniadach* fact situation, the narrow issue in our present case is whether Mrs. Tucker's situation is covered by the *Sniadach* ruling, or whether it is instead beyond the reach of *Sniadach* because the need to protect a state or creditor interest against nonresidents who may seek to escape judgment creates in all cases "an extraordinary situation" which justifies the use of summary process.

In seeking to resolve this issue, I note first that the cases cited by Mr. Justice Douglas in support of the proposition that summary procedure may well meet the requirements of due process in "extraordinary situations" almost all involve actions of a public agency. Thus, for example, in Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), the Supreme Court upheld the power of the Federal Home Loan Bank to appoint a conservator to supervise a savings and loan association whose operation it deemed injurious to interests of depositors, creditors and the public prior to any hearing. The rationale is that were a hearing to precede takeover, public confidence in the institution might be shaken, causing a run on the association's funds and making it impossible to preserve credit during the period of a hearing. Similar policy considerations support the decision of the Supreme Court in Coffin Brothers & Co. v. Bennett, 277 U.S. 29, 48 S.Ct. 422, 72 L.Ed. 768 (1928), which allowed a state bank official assigned to liquidate and pay claims of a failed bank to attach in order to satisfy stockholder liability assessments due the bank. In Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), the Supreme Court upheld a federal statute which authorized the Administrator of the Federal Food, Drug, and Cosmetic Act to order seizure of misbranded drugs without prior hearing if he determined they were adulterated or advertised in a manner likely to mislead the consumer as to their value. If seizures of such articles were delayed until after a hearing on the merits, the Court reasoned, many people could be defrauded and/or injured by consumption of the product.

tice than a delineation of the proper procedure for garnishment. For example, the Court left unanswered the question whether the required prior hearing must be a full trial culminating in judgment or whether a less complete hearing merely to establish that the claim of debt has some substance would suffice. Mr. Justice Harlan's concurring opinion contains language which may suggest that the latter is all the Court would require, but there is no indication that the majority would have shared such a view. In fact, the majority's opinion seems to be incompatible with any requirement short of a full

determination on the merits before garnishment. A partial hearing would weed out the most outrageous claims, but those subjected to the hardship of garnishment and the pressure to settle would still include defendants whose defenses would prove meritorious at a final proceeding. Any net decrease in hardship created by the procedure would not change the balance of interests, since the Court seemed to find no need at all for garnishment prior to hearing under ordinary circumstances. A partial hearing would only increase the burden on court dockets with little resulting social benefit."
(Footnote omitted.)

In addition to these three cases—in all of which administrative action by an agency of the state was said to justify summary procedure—both the majority opinion and the concurrence in *Sniadach* also cite Ownbey v. Morgan, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921), which concerned attachment of property of a nonresident debtor by a resident creditor upon refusal of the debtor to post a bond in the amount of the creditor's claim before defending. Such seizure, commonly allowed, has its roots in the need for a state to protect the interests of its own citizens in obligations owed them by non-residents.[6]

Although defendants argue that our present case is like *Ownbey* and presents an "extraordinary situation" in which summary procedure will meet the requirements of due process, I am persuaded of precisely the opposite. Defendants place great stress on the fact that plaintiff is a nonresident, and it is true that *Ownbey* endorses the right of a state to protect itself against the attempts of nonresidents to escape obligations owed to its own citizens. But our own case is so far from an *Ownbey* as to make a mockery of this comparison. In the first place, our case grows out of a suit by Household Finance, a *Maryland* company, against plaintiff, the guarantor of a note, who is also a *Maryland* resident. The sole reason why this action was brought in a District of Columbia court—as counsel for Household Finance were frank to admit in oral argument—was to take advantage of the District's prejudgment garnishment provisions, since Maryland's prejudgment garnishment law, like the District's, is not available against residents. At a minimum such forum-shopping, especially in an action in which neither party resides in our jurisdiction, should be discouraged.

But the mere disinclination to entertain forum-shopped litigation permitting seizure of a woman's salary is not the basis for this dissent. Beyond considerations of policy is the manifest unconstitutionality of the District's prejudgment garnishment provisions when applied to Mrs. Tucker. Due process must deal in realities, not rules. And what is absolutely clear from a reading of *Ownbey* and *Sniadach* is that "nonresidency" will be a factor justifying a rule of summary procedure only insofar as it is a reliable indicator that the debtor may otherwise be able to escape his legal obligations. The reality which creates an "extraordinary situation" and which justifies the summary procedure of prejudgment garnishment is the unavailability of the debtor for *personal service*—in this case in the District. Such is the clear meaning of that part of the Court's opinion in *Sniadach* which, after citing the cases discussed in text above, goes on to say:

"* * * But in the present case no situation requiring special protection to a state or creditor interest is pre-

---

6. Until *Sniadach*, the United States Supreme Court had not reviewed prejudgment garnishment, but in McKay v. McInnes, 279 U.S. 820, 49 S.Ct. 344, 73 L.Ed. 975 (1929), it had summarily affirmed the constitutionality of a Maine statute permitting prejudgment attachment without posting of bond or presentment of an affidavit. The Maine Supreme Court ruled the attachment procedure itself fulfilled the notice requirement of due process, while the opportunity to be heard was provided in the trial of the principal action. Since the lien was only temporary, and thus a provisional remedy, the Maine court held that the deprivation involved was not an unconstitutional taking. In *Sniadach*, the United States Supreme Court distinguished *McInnes* as involving "a procedural rule * * * for attachments in general." 395 U.S. at 340, 89 S.Ct. at 1822. Wage garnishment, the Court said, involved a "specialized type of property presenting distinct problems in our economic system." *Ibid.* In his concurrence, Mr. Justice Harlan expressly discounts the significance of a *per curiam* opinion like *McInnes* and indicates that the deprivation of any "unrestricted use" of property amounts to actual deprivation. I note suggestions in all of the law review commentaries that the rationale of *Sniadach* would seem to be applicable to many forms of prejudgment attachment in addition to prejudgment garnishment.

sented by the facts; nor is the Wisconsin statute narrowly drawn to meet any such unusual condition. Petitioner was a resident of this Wisconsin community and *in personam* jurisdiction was readily obtainable."

395 U.S. at 337, 89 S.Ct. at 1821.

The plaintiff in our case, although she lives in Maryland, is regularly employed by Government Services, Incorporated in Washington, D. C., and is thus regularly available for service at her place of employment within the District. Indeed, she was served there in the Court of General Sessions suit out of which the garnishment arose. I believe the District's prejudgment provision is unconstitutional as applied to her. I base this belief on *Sniadach*, which I read as holding that where, as here, a party is readily available to *in personam* service of process within the court's jurisdiction, the summary taking or suspension of her wages without a hearing on the merits of the underlying claim violates due process of law. A careful reading of recent case law—while not entirely decisive—strongly supports my position.

Since the decision of the United States Supreme Court in *Sniadach*, a number of state supreme courts have held their own jurisdictions' prejudgment garnishment statutes unconstitutional, primarily because of infirmities in the hearings provided for. *See, e. g.,* Termplan, Inc. v. Superior Court of Maricopa County, 105 Ariz. 270, 463 P.2d 68 (1969); Cline v. Credit Bureau of Santa Clara Valley, 1 Cal.3d 908, 83 Cal.Rptr. 669, 464 P.2d 125 (1970); McCallop v. Carberry, 1 Cal.3d 903, 83 Cal.Rptr. 666, 464 P.2d 122 (1970); Jones Press, Inc. v. Motor Travel Services Inc., Minn., 176 N.W.2d 87 (1970). A reading of garnishment

cases since *Sniadach* has led me to only one case outside our own jurisdiction which specifically addresses the question whether nonresidency of the debtor, without more, constitutes an extraordinary situation within the meaning of *Sniadach*. Mills v. Bartlett, Del.Super., 265 A.2d 39 (1970), holds that, to the extent that Delaware foreign attachment statutes permit prejudgment garnishment of wages due and owing to a nonresident defendant without notice and hearing, they violate due process.[7]

Within the District of Columbia Court of General Sessions, I find a split of opinion on this problem. Judge Beard has held in City Finance Co. of Mount Ranier, Inc. v. Joseph Williams, General Sessions No. 23497-67, June 18, 1969, 3 CCH Consumer Credit Guide ¶ 99,893, that "the *Sniadach* opinion is of little or no impact upon the propriety of the attachment before judgment procedure selected and adopted by Congress which provides quite reasonable protections for creditors in those extraordinary situations in which a delay of attachment until after judgment will produce only moral vindication for the plaintiff at the expense of continuing economic inequity between the parties." In giving a clean bill of health to the District's prejudgment garnishment provisions, Judge Beard placed great stress on the fact that they are narrowly drawn to permit garnishment of wages only of either nonresidents or those who intend to escape the judgment of the court. What he failed to realize, however, is that the category of "nonresidents" is still unconstitutionally overbroad, given the narrow purpose for which it was created. Not unexpectedly, this opinion has been strongly criticized in the scholarly reviews.[8]

---

7. The problem with this case is that it may go too far. Prejudgment garnishment of the wages of a nonresident debtor who is *not* available for personal service in the jurisdiction of the creditor may well be covered by the extraordinary-situation exception of *Sniadach*. At any rate, our case is easier, involving as it does a nonresident who was easily and regularly available for personal service.

8. *See, e. g.,* 7 Harv.J. on Legis. 231, 235–236 (1970):

"Garnishment is a device which has been employed to gain jurisdiction over persons in lieu of personal service. The continued viability of the use of wage garnishment to obtain jurisdiction over absent defendants is in doubt. After mentioning that summary procedures may meet the requirements of due

There is, however, a still more recent opinion from the Court of General Sessions which I believe expresses a much sounder view of the constitutionality of our District prejudgment garnishment provisions. In Department of Labor Federal Credit Union v. Henry H. Raynor, General Sessions No. 2355–70, September 2, 1970, Judge Belson permitted garnishment of the back wages of former government employees, both of whom had left this jurisdiction and taken up residence in North Carolina before completing payment of a debt owed to a local credit union. Judge Belson found that the District provisions were constitutionally applied to these particular debtors because they were not available for *in personam* service and because garnishment was necessary to insure full payment of their debt, provided it proved to be legally incurred. But the court was also prompt to note that this result was reached despite its realization that

"in a substantial number of instances, very possibly the majority of such cases, this Court's prejudgment attachment procedures are utilized in situations which do not merit special protection as that term is used in *Sniadach*.

"District of Columbia Code Section 16–501(d) (1), adopted long before *Sniadach*, subjects all nonresidents to summary prejudgment attachment; and no attempt was made to frame the statute so narrowly as to include within its sweep only nonresidents in special situations. It is a matter of common knowledge that tens of thousands of wage earners are employed daily in the District of Columbia but reside in nearby Maryland or Virginia. All such persons are subject to prejudgment attachment of their wages. Furthermore, it is notorious that the broad garnishment procedures of this jurisdiction are utilized frequently by non-

process in extraordinary situations, the Court noted that Mrs. Sniadach was a domiciliary of Wisconsin and therefore the Wisconsin state courts had personal jurisdiction over her. This raises a possible negative implication that wage garnishments directed at non-residents who might not otherwise be subject to the jurisdiction of the court are constitutional. However, the hardships of wage garnishment emphasized by Mr. Justice Douglas are suffered equally by defendants who live inside and outside the state, and a non-resident defendant may be additionally burdened if he is forced to defend a suit far away from his home. Therefore, if the rationale of the Court's decision is that there cannot be prejudgment garnishment of property if that garnishment will result in undue hardship for the defendant, there would be no distinction between garnishment against in-state and out-of-state wage-earners: both kinds of garnishment would be impermissible. Moreover, in some situations garnishment in a remote jurisdiction has been used to evade exemptions provided in the wage-earner's home state, and such garnishments may be brought to harass the debtor by imposing on him needless expense. Nevertheless, a District of Columbia court has interpreted *Sniadach* narrowly and has allowed prejudgment garnishment of wages held by

a District of Columbia employer where the defendant was a resident of Virginia but worked in the District of Columbia, despite the fact that the only immediate hearing available to the defendant permitted challenges to the grounds for attachment but did not permit challenges to the merits of the plaintiff's claim.

"There are no compelling policy reasons for distinguishing between garnishment of in-state and out-of-state wage-earners *in order to protect the creditors'* interest in bringing absent defendants within the jurisdiction of the court: a logical extension of *Sniadach* would strike down both types of garnishment. In situations where the plaintiff is seeking jurisdiction over a non-resident defendant by garnishing the defendant's employer in the plaintiff's home state, the case where such garnishment is the only method of obtaining jurisdiction over the defendant will be rare. The plaintiff in *City Finance* who was suing a defendant who resided in Virginia but whose employer was located in the District of Columbia did not have to garnish the defendant's wages to obtain jurisdiction over the defendant in the District of Columbia. The plaintiff could have served the defendant personally when he appeared in the District of Columbia at his job."
(Footnotes omitted.)

580

resident plaintiffs against nonresident defendants in cases where the only connection between this jurisdiction and the cause is that the defendant's employer does business in and is amenable to suit in the District of Columbia. It is regrettably true also that District of Columbia attachments are sometimes resorted to for the sole purpose of circumventing the wage exemption laws of other jurisdictions which protect wage earners who live and work there. * * *

"In the foregoing and other situations not presented by this case, it would appear that the procedures followed by this Court do not meet the requisites of due process enunciated in *Sniadach*. Until that situation is remedied, it would appear that the proper course for this Court will be to reject challenges to writs of attachment before judgment in cases of this type only where the Court is convinced, as it is in this case, that it has before it a special situation which justifies the use of the procedures currently in force. * * *"

(Citations and footnote omitted.)

A survey of law review commentaries since the Supreme Court decision in

*Sniadach* indicates that scholarly opinion is virtually unanimously in favor of the position that availability to personal service and not mere nonresidency is the touchstone in determining due process in the circumstances of this case. *See, e. g.,* Note, Attachment in California: A New Look at an Old Writ, 22 Stan.L.Rev. 1254 (1970); Note, The Constitutional Validity of Attachment in Light of Sniadach v. Family Finance Corp., 17 U.C. L.A.L.Rev. 837 (1970); Note, Garnishment Statutes and Due Process: The Effect of Sniadach v. Family Finance Corporation, 7 Harv.J. on Legis. 231 (1970); Note, Law and Poverty: Summary Prejudgment Wage Garnishment Held Unconstitutional, 1969 Duke L.J. 1285; Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 113–118 (1969); Note, Constitutional Law—Due Process—Prior Hearing in Wage Garnishment, 1970 Wis.L.Rev. 181. The journals suggest that the real teaching of *Sniadach* is that wage garnishment prior to judgment may constitutionally be resorted to only upon a showing that all other efforts to obtain *in personam* jurisdiction and to protect a subsequent judgment have failed.[9]

It is notorious but true, as the Supreme Court found in *Sniadach* and as Judge

9. As the Harvard Law Review put it:
   " * * * The Court, after denying that special need existed in *Sniadach*, mentioned that in personam jurisdiction might readily have been obtained by the creditor; this indicates that a valid use of prejudgment garnishment is to meet a need for quasi in rem jurisdiction. State statutes and the historical origin of attachment suggest an additional proper use: to prevent the defendant from fleeing or fraudulently conveying his property. A real need for quasi in rem jurisdiction would likely occur only when neither the creditor's residence nor his place of business is the same as the home or job location of the debtor so that in personam jurisdiction would not be readily available. Since, however, the employee's wages can be the basis of quasi in rem jurisdiction in any state in which the employer can be served, creditors might attempt to take advantage of quasi in rem jurisdiction by choosing when possible to sue in a state where the debtor could not be located but where the employer could be served with garnishment process. To prevent this avoidance of *Sniadach's* requirement, the creditor should be required to establish a real need for quasi in rem jurisdiction by showing that it would not be equally convenient and appropriate to sue where the debtor can be personally served. In any event, should the debtor agree to in personam jurisdiction there would exist no justification on a jurisdictional basis for continuing the garnishment."
   83 Harv.L.Rev. 7, 115–116 (1969). (Footnotes omitted.)

Belson found in the District of Columbia, that prejudgment garnishment of wages is often used not to protect the creditor's claim—garnishment after judgment can do that—but to deprive the wage-earning "debtor" of his day in court. People who need their wages to live on arrange to pay the claim, irrespective of its validity, in order to lift the garnishment. It is also notorious and unfortunately true that too often the "debt" which provides the basis for the garnishment " 'is a fraudulent one, saddled on a poor ignorant person who is trapped in an easy credit nightmare, in which he is charged double for something he could not pay for even if the proper price was called for * * *.' " *Sniadach, supra,* 395 U.S. at 341, 89 S.Ct. at 1822.[10]

I respectfully dissent.[11]

---

[10]. Since the writing of this dissent, it has come to my attention that Judge Beard has apparently reversed his own position, as described above, and joined in that of Judge Belson. See Holiday Health, Inc. v. Jolly, General Sessions No. 19111–70, October 28, 1970, in which Judge Beard granted a motion to quash a garnishment filed by a Maryland resident who works in the District of Columbia. Thus it would appear that the majority in this case has relied upon a position repudiated by its author before our writing. There now appears to be agreement among the judges of the court which administers the statute that the interpretation propounded by the majority in this case is inconsistent with the rationale of *Sniadach.*

[11]. In addition to her due process argument —which I find to be dispositive for the reasons discussed above—plaintiff has also argued that the District's prejudgment garnishment provisions are in violation of the equal protection clause. Plaintiff notes that, although legislatures are normally presumed to have acted constitutionally, with the result that legislative classifications will be set aside "only if no grounds can be conceived to justify them," McDonald v. Board of Election, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969), such a standard of court review is not always proper where other constitutional rights are involved. Thus where the classifications are drawn on the basis of "suspect" criteria such as race or wealth, or if the result of a classification may be to affect a "fundamental right," such as the right to vote, Harper v. Virginia Board of Elections, 383 U.S. 663, 668, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), or the right of interstate movement, Shapiro v. Thompson, 394 U.S. 618, 627, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the judicial scrutiny must be more exacting. In such situations, an invidious classification will be upheld only if there is a "compelling interest" on the part of the governmental body to justify it. Shapiro v. Thompson, *supra*, 394 U.S. at 658–662, 89 S.Ct. 1322 (dissenting opinion of Mr. Justice Harlan). Without reaching this question, I note that plaintiff has made out a strong case that such an exacting review is required here, since the result of the residency classification plainly affects the fundamental requirements of due process—notice and an opportunity to be heard. The District's provisions, at least as they apply to Mrs. Tucker, would seem to violate the equal protection clause because the District has no compelling interest in maintaining the classification involved here which operates discriminatorily against nonresidents available for personal service.