**In the Matter of Yvonne Elizabeth SMITH, Bankrupt, Petitioner on Review.**

**UNITED STATES of America, Amicus Curiae.**

**No. 70–B–1138.**

United States District Court, D. Colorado.

Feb. 24, 1971.

James H. Seckinger, Southwest Valley Legal Services, Denver, Colo., for petitioner on review.

James L. Treece, U. S. Atty., and Carolyn J. McNeill, Asst. U. S. Atty., Denver, Colo., for amicus curiae.

### MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

This case raises the question whether an indigent person who files a petition in bankruptcy must pay a filing fee in order to be entitled to a discharge.

On April 6, 1970, petitioner Smith sought leave of the bankruptcy court to proceed *in forma pauperis.* In an affidavit accompanying her motion, she alleged the facts of her indigence and

stated that she could not honestly promise to pay the $50 filing fee in nine months. In a separate motion she sought permission to proceed with bankruptcy pending judgment on the motion to file *in forma pauperis*. This court denied the latter motion but granted permission for petitioner to pay the fee in installments, without prejudice to her request to proceed *in forma pauperis*. Petitioner then filed a bankruptcy petition with an application to pay the fee in installments pursuant to Rule 7(b) of the 1967 Bankruptcy Rules of this court, Section 59, sub. g of the Bankruptcy Act and General Order in Bankruptcy 35(4) (b). Administration is proceeding in accordance with the normal routine, except that no order for installment payments was entered at the first meeting of creditors.

In support of her motion to file *in forma pauperis*, petitioner makes both statutory and constitutional arguments. She urges that the Bankruptcy Act does not prohibit such petitions and that the act should be construed, in keeping with its remedial purpose, to permit application of the federal *in forma pauperis* statute, 28 U.S.C. § 1915 (1964), or, in the alternative, application of federal common law principles favoring such petitions. She further argues that to condition discharge upon the payment of a filing fee is a violation of the fifth amendment right of due process, more precisely equal protection, and the first amendment right to petition the government for redress of grievances. Because petitioner's memorandum raised questions concerning the proper construction and the constitutionality of the Bankruptcy Act, notice was given to the Attorney General of the United States, in accordance with 28 U.S.C. § 2403 (1964). Thereafter, the United States entered this proceeding as *amicus curiae* and filed a brief in opposition to petitioner's motion. On June 12, 1970, the referee in bankruptcy issued a memorandum opinion and order denying petitioner's motion to proceed *in forma pau-*

*peris*. Petitioner seeks review of the referee's decision.

## I.

■ We agree with the referee's conclusion that Congress intended to require full payment of filing fees as a condition precedent to a discharge in bankruptcy. This conclusion seems to us, as it did to the referee, inescapable. Prior to 1946, the Bankruptcy Act permitted proceedings *in forma pauperis*. 30 Stat. 558–559. In that year Congress revised the act with at least two purposes in mind: to abolish the fee method of paying referees and to make the bankruptcy system self-supporting. Shaeffer, Proceedings in Bankruptcy in Forma Pauperis, 1969 Colum.L.Rev. 1203, 1205–08. In furtherance of these purposes, Congress repealed the *in forma pauperis* statute and provided that referees be paid a salary commensurate with their services. 11 U.S.C. § 68(a) (1964). Apparently in order to insure that voluntary bankrupts would pay their way, Congress specifically provided that payment of a filing fee is a condition precedent to discharge. 11 U.S.C. §§ 32(b), (c) (8), 68(c) (1), 95(g).

Petitioner does not directly dispute this evidence of congressional intent but rather seeks to diminish any importance which might be attributed to it. She argues that nowhere in the act are *in forma pauperis* petitions specifically *prohibited* and that this omission, coupled with a liberal construction appropriate in cases of remedial legislation, suggests that such petitions should be permitted in accordance either with the federal *in forma pauperis* statute or with general principles of federal common law. In support of her view that Congress did not intend to preclude *in forma pauperis* petitions but merely overlooked the possibility that a person might not have funds sufficient for filing, petitioner quotes the following from a Senate report on the 1946 bill:

It [11 U.S.C. § 68(c) (1964)] also abolishes the so-called pauper peti-

tions. Under the existing statutory provisions a bankrupt is permitted to file a petition without the payment of any filing fees when he accompanies it with an affidavit indicating his inability to pay them. In such instances, however, many of the referees have later collected the filing fees in installments from the bankrupts. It is deemed desirable, in lieu of the present widespread practice of demanding payment ultimately, to abolish pauper petitions. It seems more advisable to provide for installment payments in meritorious cases and to leave the exact procedures for incorporation in the general orders of the Supreme Court. This has the additional merit of permitting future modifications as experience develops in a relatively simple and direct fashion. S.R. 959, 79th Cong., 2d Sess. (1946), U.S. Code Cong.Serv.1946, p. 1236.

While we agree that this language is unclear and may indicate that Congress overlooked the plight of indigents, we do not agree that the statement, standing alone, can be said to prove much. Against this single indication that Congress had forgotten the poor is the considerably stronger evidence that Congress knew perfectly well what it was doing. As previously mentioned, Congress repealed the *in forma pauperis* provision in the prior version of the act and required that discharge be granted only after payment of a filing fee. Petitioner's suggestion that we construe the act in light of its remedial purpose ignores not only this evidence but also the importance of another congressional purpose—to make the bankruptcy system self-supporting. The abolition of *in forma pauperis* proceedings is clearly one method for resolving the conflict between these two purposes, and we conclude that it is the method which Congress chose. This conclusion agrees with that reached in In re Garland, 428 F.2d 1185 (1st Cir. 1970), the only other case we have discovered which fully discusses this question. *See also* In re Barlean, 279 F.Supp. 260 (D.Mont. 1968).

Since we have decided that Congress intended to abolish *in forma pauperis* proceedings in bankruptcy, we must reject petitioner's claim that she is entitled to file under the *in forma pauperis* statute or should be granted a federal common law right to file. It would be unreasonable to conclude that Congress intended to grant through the earlier *in forma pauperis* statute what it specifically denied in a later version of the Bankruptcy Act or that Congress intended to leave room for the judiciary to create a common law right. The statutory guide to construction that the specific governs the general seems to us most likely to reflect what Congress intended.

II.

The referee also ruled that the filing fee requirement does not violate the fifth amendment right of due process, which includes equal protection, or the first amendment right to petition the government for redress of grievances. We will not consider the first amendment claim, since we have concluded, for reasons set forth below, that the Bankruptcy Act's filing requirement does deny to indigents the equal protection of the laws.

We should state at the outset that we find equal protection difficult to discuss intelligently. One traditional branch of equal protection doctrine, articulated most often in economic regulation cases, is based upon strict, even rigid, rules and upon deference to legislative judgment and expertise. *See* Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341, 346 (1949). However, in more recent Supreme Court cases involving what are judged to be "suspect classifications," "fundamental interests" and other special considerations, equal protection theory has been altered so dramatically that it is now inaccurate to state that the doctrine is concerned with but one kind of equality. *See generally* Developments in the Law—

Equal Protection, 82 Harv.L.Rev. 1067 (1969). A difficulty with these latter cases, some of which will be discussed below, is that stirring language has replaced the sort of analysis which provides a guide to decision-making. Perhaps this is because equal protection, like due process, is now conceived of less as a rule than as the expression of an ideal.

If all that concerned us here were traditional equal protection theory, we would have no difficulty concluding that the Bankruptcy Act's filing requirement is constitutional. The main purpose of the bankruptcy system is to enable persons in debt to obtain a judicially-sanctioned discharge of their obligations. Since every person who wishes to avail himself of this service must pay a filing fee, the act treats in an equal manner all those similarly situated with respect to the purpose of the law. Tussman & tenBroek, *supra,* at 346. One way to characterize traditional equal protection theory is that government must abide by the principle of numerical equality, *i. e.,* every person, no matter what his individual circumstance, must be treated in exactly the same manner as all other persons similarly situated with respect to the purpose of the law in question. Recent Developments, *supra,* at 1163–66. It is ironic, of course, that those with the fewest assets may be unable to afford bankruptcy, but this does not render the act arbitrary or capricious in light of Congress' intent to make the system self-supporting. It seems to us eminently reasonable that bankrupts be required to pay for the cost of securing their own relief. Even if bankruptcy were to be considered social welfare rather than economic legislation, the Supreme Court's recent decision in Dandridge v. Williams, 397 U.S. 471, 484–485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), indicates that, unless a freedom guaranteed by the Bill of Rights is involved, a classification with a reasonable basis is not unconstitutional solely because in practice it results in some inequality. Whatever may be the scope of the *Dandridge* opinion, it certainly does not impose upon government a duty greater than to provide numerical equality.

Even outside the area of economic regulation and analogous legislation, there is no general duty to provide other than numerical equality. Thus, for reasons based upon our assumptions about the proper function of government, numerically equal and otherwise reasonable treatment which has the effect of denying something to the poor has not been considered in itself to work an invidious discrimination. *See* Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *but see* Shapiro v. Thompson, 394 U.S. 618, 633, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *see generally* Michelman, On Protecting the Poor Through the Fourteenth Amendment, 83 Harv.L.Rev. 7 (1969). Nevertheless, this reluctance to decide that poverty is an invidious classification has given way in those rare cases in which the Supreme Court has found a "fundamental interest" at stake. Thus, in Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the court held that Virginia's poll tax worked an invidious discrimination because exercise of the right to vote was conditioned upon economic status. Passing over the question whether state voting may, in some circumstances, be a constitutional right, the court concluded that voting is nevertheless a "fundamental matter" which, once granted, may not be conditioned upon wealth. The court explained its judgment that voting is "fundamental" by characterizing it as *preservative of all rights.* The following was quoted from Reynolds v. Sims, 377 U.S. 533, 561–562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1963):

Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement

of the right of citizens to vote must be carefully and meticulously scrutinized.

The poll tax at issue in *Harper* was used to support "free public schools." Harper v. Virginia Board of Elections, *supra*, 383 U.S. at 664 n.1, 86 S.Ct. 1079 (1966). While the court did not discuss whether this revenue-raising device was in itself reasonable, it did state that payment of the tax had no relation to voter qualification. Thus, it would seem that a tax levied to support the voting system would have been equally impermissible.

In an earlier case the Supreme Court used the "fundamental interest" approach, though not the phrase, in ruling that Illinois deprived indigents of equal protection by requiring that all appellants in criminal cases pay for a transcript of the trial record used on appeal. Griffin v. Illinois, 351 U.S. 12, 76 S. Ct. 585, 100 L.Ed. 891 (1956). *See also* Williams v. Oklahoma City, 395 U.S. 458, 89 S.Ct. 1818, 23 L.Ed.2d 440 (1968); Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1962); Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1960). As in *Harper*, the court did not hold that a constitutional right was at stake; rather it viewed the question to be whether a state which grants the right to appeal can impose conditions on that right which have an effect of discriminating against the poor. The interest at stake in *Griffin*, though less succinctly stated than the interest identified in *Harper*, concerned the final adjudication of guilt or innocence and the provision of "equal justice." *Id.*, 351 U.S. at 18–19, 76 S.Ct. 585. Implicit in the court's holding is the judgment that, when a fundamental interest is involved, equal protection is denied even if performance of a service is conditioned upon payment of a fee which supports provision of that service.

Also implicit in *Griffin* is the judgment that equal protection does not have a single meaning. As Mr. Justice Harlan noted, dissenting in *Griffin, id.* at 34–35, 76 S.Ct. 585, the majority's holding required that Illinois discriminate in favor of those without funds and against those who could afford a transcript. If analyzed in traditional equal protection terms, the majority's ruling does indeed make mandatory a kind of discrimination. What the court appears to require in the "fundamental interest" cases is a crude form of proportional equality, which may be defined as numerically differing treatment of persons in accordance with differences in their circumstances. Recent Developments, *supra*, at 1166. If viewed in terms of proportional equality, traditional equal protection theory also works a kind of discrimination. As has been pointed out, "treating people differently in one respect always results in unequal treatment in some other respect." *Id.* at 1179.

Counsel for the United States argue that bankruptcy is not a fundamental interest. We agree that, standing alone, bankruptcy cannot be placed on a par with voting or with appealing from a criminal conviction. However, we believe what is at stake here is not simply bankruptcy but access to court. So viewed, the question presented takes on a greater significance, at least for those of us who are trained in the law and who regard the legal system as fundamental to our way of life. We are inclined to think that the function which the judiciary performs is at least as important as the electoral process. Both are preservative of rights, and both are potentially destructive of them. Because of its traditional concern for the individual and because it strives to operate on the basis of reason rather than numbers, the judiciary is perhaps the less potentially destructive of the two branches of government. In our scheme of things, the quality of individual life, which depends in part upon the vindication of private rights, is surely of an importance comparable to the principle of majority rule.

Of course, filing fees were once more common than they are today and apparently they were not thought to impose an impermissible condition upon access

to court. *See* The Indigent's Right to Counsel in Civil Cases, 76 Yale L.J. 545, 559 (1967). However, to our knowledge the question before us has been decided by only one federal circuit court of appeals, in a recent case which will be discussed below. In any event, we do not regard ourselves as bound by an historical argument, particularly in light of the fact that the Supreme Court has not to our knowledge decided the question. In overruling a prior decision upholding the constitutionality of the poll tax, the *Harper* court stated:

> We agree, of course, with Mr. Justice Holmes that the Due Process Clause of the Fourteenth Amendment "does not enact Mr. Herbert Spencer's Social Statics" (Lochner v. [People of State of] New York, 198 U.S. 45, 75 [25 S.Ct. 539, 546, 49 L.Ed. 937]). Likewise, the Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights. See Malloy v. Hogan, 378 U.S. 1, 5–6 [84 S.Ct. 1489, 12 L.Ed.2d 653]. Notions of what constitutes equal treatment for purposes of the Equal Protection Clause *do* change. Harper v. Virginia State Board of Elections, 383 U.S. 663, 669, 86 S.Ct. 1079, 1082 (1965).

■ We assume that the federal government would be permitted to make a classification otherwise violative of equal protection if it has a compelling interest in so doing. Shapiro v. Thompson, 394 U.S. 618, 633–634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). While neither *Harper* nor *Griffin* discusses governmental interest in terms of the "compelling interest" doctrine, by implication both cases rest upon the judgment that saving money is not an interest of sufficient importance to be classified as compelling or overriding. Mr. Justice Brennan, writing for the court in *Shapiro,* so indicated. *Id.* at 633, 89 S.Ct. 1322. These three cases suggest that the Supreme Court would not view fiscal integrity, or, in the case of bankruptcy, Congress' intent that the system be self-supporting, as a compelling interest. Indeed, it is difficult to imagine that fiscal integrity could ever be described as a compellng interest in other than grave financial circumstances.

■ By characterizing the problem presented in this case as one of equal protection, we do not mean to suggest that fifth amendment due process takes in all of fourteenth amendment equal protection. It is enough to note that fifth amendment due process does include an equal protection principle, Shapiro v. Thompson, 394 U.S. 618, 641–642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and that the two provisions are co-extensive insofar as they prohibit discrimination based upon race, Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954), and other discriminations which are invidious or deprive persons of constitutional rights. Shapiro v. Thompson, supra. What Mr. Chief Justice Warren, writing for a unanimous court, said of racial discrimination ought to be equally applicable where fundamental interests are at stake:

> In view of our decision that the Constitution prohibits the states from maintaining racially segregated public schools, it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government. Bolling v. Sharpe, at 500, 74 S.Ct. at 695.

It may be argued that our approach to this case has two defects: first, we should treat the problem before us as access to bankruptcy, not access to court; second, even if access to court is a proper analysis, bankruptcy is not a "court proceeding" in the normal sense of that phrase.

No doubt the heart of this opinion is the choice of how to discuss petitioner's

claim. We have chosen to cast the issue in terms of a generality. The phrase "access to court" does for us have a meaning: it denotes access to the broad and intricate scheme for private dispute-settling and the enforcement of public and private rights. Of course, no one seeks "access to court," the generality. What is sought is use of the courts for particular purposes: compensation for the negligent infliction of an injury, enforcement of a contract, *etc.* Yet when "access to court" is broken down into individual, almost innumerable, rights and remedies, none, standing along, seems of fundamental importance. For example, if a condition of bringing a negligence action were the payment of a filing fee, such a condition, while perhaps unwise, probably could not be said to affect a fundamental interest. Thus, by regarding the problem as access for a particular purpose, the generality "access to court" is so broken down and divided into less significant parts that the broad phrase itself is reduced to insignificance. It is our conviction that the generality has meaning and poses a problem worthy of consideration that leads us to reject a narrow view.

Our choice of characterization can be further explained by posing the problem in a more dramatic form: if a state or the federal government were to condition the enforcement of all statutory and common law rights upon the payment of a $5,000 filing fee, access to court as we now conceive it would be severely impaired. The courts would become, more than ever, a battleground for the rich. Since to a person without funds, $50 may foreclose access as surely as $5,000 the amount of the fee is of no particular meaning unless *de minimus. See* Smith v. Bennett, 365 U.S. 708, 712, 81 S.Ct. 895, 6 L.Ed.2d 39 (1960). If we were to begin attacking the above scheme by deciding that only the exercise of certain rights could be so conditioned, how would we make the choice? Would we decide this issue on the basis of how many people avail themselves of the particular action? On some other standard for judging the social importance of the right? How do we devise a scale for measuring the importance of bankruptcy as compared with any other statutory or common law action? These questions again pose the difficulty of discussing and comparing rights and remedies as discrete entities. To choose from among them those which seem most important strikes us as a fruitless line of enquiry.

A second objection to the approach taken here is that bankruptcy is not a court proceeding. It is certainly true that the Bankruptcy Act establishes not only a special right but a special proceeding which differs in many ways from ordinary court proceedings. However, we do not believe it necessary for us to decide whether these differences would be controlling—a decision which would first require a definition of that problematic term "court proceeding." We assume that the phrase comprehends at least all those proceedings which are in fact conducted in courts and which are stamped with a judicial imprimatur. A bankruptcy proceeding, by congressional design and by common understanding, is so stamped. The proceedings are conducted in United States District Courts by referees or judges who, in addition to their special bankruptcy duties, have the general power to decide legal questions which arise in such proceedings, including the constitutional question before this court. 11 U.S.C. § 11 (1964). See also the definitions of "court" and "courts of bankruptcy" in 11 U.S.C. § 1(9), (10) (1964).

### III.

■ Our holding that the bankruptcy filing fee violates equal protection disagrees with the result reached on the constitutional issue by the first circuit in In re Garland, 428 F.2d 1185 (1st Cir. 1970). The *Garland* court distinguished bankruptcy from other court proceedings on the theory that bankruptcy is "not

litigation in the normal understanding of that term" but rather resembles an "administrative" proceeding. *Id.* at 1187. We find it difficult to make use of the labels "administrative" and "court" proceedings. While we agree that most court proceedings are adversary and that, as to a bankrupt, a bankruptcy proceeding more resembles interpleader than it does ordinary civil litigation, we are reluctant to conclude that adversity in the prototypical sense is always an essential ingredient of a judicial action. We also find that "adversity" is not a helpful term for distinguishing "administrative" from "court" proceedings.

The nub of the first circuit's decision appears to be a judgment about what is at stake in a bankruptcy proceeding:

> The primary question must be why an individual admitting no assets has need for a discharge. If he has nothing, or if whatever he has is exempt under 11 U.S.C. § 24, it would seem that his creditors would find it pointless to pursue him. If they should pursue, one would wonder what the debtor could have to be concerned about. We can think of only two classes of seemingly assetless persons who might want a discharge: those who in fact have assets, but hope to conceal them, and those who have none, but, as present petitioners claim for themselves, expect future assets, and wish to be rid of their creditors first. The first category deserves, of course, no consideration. We do not think the claim of the second so compelling that they must be constitutionally entitled to a free discharge. *Id.* at 1187–1188.

We disagree that the interest of an assetless person is necessarily less important than the interest of one who has $50 for a filing fee and few, or no, assets to be divided among creditors. The petitioner in this case states as her reason for seeking bankruptcy a desire to escape the embarrassment and strain of creditor harassment, and we think it inappropriate and even impossible to second-guess the precise nature of the interests and motives which Congress intended to protect.

The *Garland* court was also concerned about the cost of requiring *in forma pauperis* petitions in bankruptcy. *Id.* at 1188. The United States, as *amicus* in this action, also informs us that a decision favoring petitioner could prove expensive for the government. We agree with *Garland* that the filing fee requirement is eminently reasonable and would survive an attack based upon traditional equal protection theory, but as we have framed the issue the government must show a compelling interest in making the requirement. We note, simply in passing, that since 1966 the bankruptcy system has not been self-supporting and some believe it is no longer possible to maintain such a system without placing an "inordinate financial burden upon bankrupts and the assets of bankrupts." 1969 Annual Report of the Director of the Administrative Office of the United States Courts 75–76, 177 (1970).

In Boddie v. Connecticut, 286 F.Supp. 968 (D.Conn.1968), the United States District Court for the District of Connecticut faced what we consider to be an analogous problem and concluded that petitioners there did not have a constitutional right to seek divorce in Connecticut courts without payment of a filing fee. The court found that access to court is not a fundamental interest:

> Although with some hesitation, we conclude that the court should not, by resort to the Constitutional guarantees which for 100 years have been considered not to demand such state action, attempt to speed up the amelioration of the lot of the indigent by forcing the state to provide free access to the civil courts without payment of a relatively modest fee. We should rather leave this to correction by the political process through legislative action, which may reach a more

satisfactory result more speedily than the presently available machinery of the courts can effectively accomplish. *Id.* at 974 (footnotes omitted).

While we have decided to the contrary, we do so with a similar sense of hesitation. The Supreme Court, which has noted probable jurisdiction in the *Boddie* case, 395 U.S. 974, 89 S.Ct. 2138, 23 L. Ed.2d 763 (1968), may soon state its view, at least on the problem of access to court in general. *See also* Lee v. Habib, 424 F.2d 891 (D.C.Cir.1970); Bynum v. Connecticut Commission on Forfeited Rights, 410 F.2d 173 (2d Cir. 1969); Frederick v. Schwartz, 296 F. Supp 1321 (D.Conn.1969).

## IV.

The general practice of this and other federal courts is to accept an indigence affidavit at face value, at least in the absence of information to the contrary. We do not believe that procedure would be appropriate here, both because the normal practice is based upon *in forma pauperis* statutes, not upon the Constitution, and because bankruptcy is a special kind of proceeding. In bankruptcy the trustee, under the supervision of the court, investigates and takes charge of a bankrupt's non-exempt assets for the benefit of creditors. A scrutiny of the bankrupt's financial affairs is basic to the proceeding and thus, we think, appropriate in considering the question of indigence. In this section of our opinion, we will examine petitioner's claim of indigence and also discuss some aspects of what we believe to be the special relationship between indigence and bankruptcy proceedings.

A difficulty we encounter at the outset is defining indigence. The Supreme Court has not to our knowledge ever defined the term, although the court has used it in literally hundreds of decisions. It is true that the Supreme Court and numerous lower courts have construed the meaning of indigence as used in the federal *in forma pauperis* statute, 28 U.

S.C. § 1915 (1964), and in the Criminal Justice Act of 1964, 18 U.S.C. § 3006A, but these cases are not much help in defining indigence in the constitutional sense. *E. g.,* Adkins v. E. I. DuPont, 335 U.S. 331, 69 S.Ct. 85, 93 L.Ed. 43 (1948); Samuel v. United States, 420 F.2d 371 (5th Cir. 1969). In only one case we have found has the Supreme Court ruled that a particular petitioner was indigent in the constitutional sense and therefore entitled to proceed *in forma pauperis* in a criminal case. Seals v. Alabama, 380 U.S. 254, 85 S.Ct. 943, 13 L.Ed.2d 818 (1965), reversing 276 Ala. 654, 165 So.2d 742 (1964). The court's five-line *per curiam* decision states a holding but does not give any reasons in support of it. Further on in this section of our opinion, we will briefly discuss the facts of the *Seals* case as represented by the Alabama Supreme Court, since these facts, coupled with the Supreme Court's summary reversal, suggest a manner in which the Supreme Court might approach the problem.

We *have* found a few trial court decisions which discuss the constitutional meaning of indigence. *E. g.,* Bramlett v. Peterson, 307 F.Supp. 1311 (M.D.Fla. 1969); Cuevas v. Wilson, 264 F.Supp. 65, 72 (N.D.Cal.1966); In re Trevithick, 260 F.Supp. 852, 853 (D.C.S.D.1966). The *Bramlett* court, though avoiding a general definition, listed several factors which it thought relevant in determining whether a person is indigent for the purpose of being entitled to counsel in a criminal case:

The determination of indigency rests in the sound discretion of the court, but it should take into consideration whether the accused has a family or other dependents and how many, if the accused is presently employed or is on welfare, whether he has income while he is in custody, what amount, if any, he has in checking or savings accounts, the extent of any indebtedness, whether he is incarcerated or free on bond, and whether he has adequate assets not presently encumbered

or otherwise unavailable. 307 F.Supp. at 1323.

In the affidavit supporting her motion to file *in forma pauperis*, petitioner Smith, who is a widow with no dependents, states that her monthly income is $181.20, of which $116.20 is Social Security Disability and $65 is Aid to Needy Disabled. The Denver Department of Public Welfare has budgeted her monthly needs as follows: $39 for food and personal expenses; $110 for shelter; $15 for utilities; $10.75 for transportation; $6.75 for telephone. Petitioner states that the budget equals her actual monthly expenses of $181.20 for basic needs and that she lacks money to replace clothing. In addition, petitioner, who had worked all of her adult life until she became ill, alleges that she has used up her life savings except for $12. She also states that the welfare people will not pay the filing fee and that she is embarrassed to ask friends or relatives for further help.

■ We will not attempt to set forth a complete definition of indigence, but we think it fair to state that a person who cannot afford to live from day to day and also pay the cost of a court filing fee is indigent for the purpose of being entitled to proceed without prepayment of costs. To require that a person seeking access to court be so destitute as to be unable to maintain himself from day to day would deny access as surely as does the filing fee requirement.

■ In addition to her monthly income, petitioner has a few assets which apparently would be exempt from distribution in bankruptcy, 11 U.S.C. § 24 (1964), because exempt from attachment and execution generally under Colorado law. Colo.Rev.Stat.Ann. § 77–2–1 et seq. (1963). The fact that certain assets may be exempt does not mean that we are precluded from taking them into account in determining whether a person is indigent. Indeed, the Bankruptcy Act's *in forma pauperis* provision, re-

pealed in 1946, was generally interpreted to mean that a pauper is one totally without assets, even exempt ones. *E. g.,* In re Medearis, 291 F. 709 (W.D.Tex. 1923); In re Collier, 93 F. 191 (W.D. Tenn.1899); *see generally* 2 Collier, Bankruptcy § 51.04 (14th ed. 1969). While this rule, which was based on a construction of the Bankruptcy Act, not the Constitution, seems to us overly harsh, a rule that exempt property cannot be considered seems overly generous toward those who could obtain, without undue hardship, the moderate sum necessary for filing. We think that state statutes governing the kinds and amounts of property exempt from attachment and execution should be given some weight as legislative expressions of what may be needed to subsist in a particular region at a particular time. However, such statutes cannot be considered conclusive on the constitutional question, particularly in light of the probability that they were not intended even as legislative definitions of indigence.

■ In her "Statement of Affairs" filed with the bankruptcy court, petitioner Smith claims $325 in assets, all of which are listed as exempt in kind and amount under Colorado law: clothing, $100; jewelry, $10; household furnishings and appliances, $130; automobile, $35; and a grave site, $50. If this is an accurate accounting of all of petitioner's worldly possessions, we have no difficulty deciding that she is indigent and should not be required, in effect, to sell some of these meager assets to obtain funds for filing. The *Seals* case, *supra,* provides some support for our conclusion. There the Supreme Court reversed the Alabama court's decision that Seals was not sufficiently indigent to be entitled to a free transcript (cost: $1,-800) to appeal his criminal conviction. The Alabama Supreme Court based its ruling upon evidence that Seals had already spent $9,000 on his defense, including $5,800 for attorneys. While there is no certainty that, because Seals

had spent $9,000, other funds were available or procurable, the Supreme Court's summary reversal indicates that its view of indigence would be unbegrudging enough to include the condition of the petitioner in this case. All of petitioner Smith's assets, other than the grave site, are reasonably necessary for day-to-day living and we are unwilling to rule that she must, in effect, give up her provision for a resting place beside her deceased husband.

Since as yet we have only petitioner's version of her financial status, we can do no more than rule that she may proceed without prepayment of costs. However, we do so on the understanding that petitioner's claim of indigence is subject to review by the referee should her status change or should facts come to light which indicate that her condition is more favorable than she has portrayed it.

Indigence is not necessarily a continuing condition. Most of us have been considerably poorer at some times in our lives than at others. One purpose of bankruptcy is to enable individuals to become free of their debts and work toward a more secure financial position. Petitioner in this case states that she has nearly recovered from the illness which came over her two and a half years ago and hopes to return soon to full-time employment. We think it would be constitutionally permissible, and also appropriate, for the referee, at the final disposition of this case, to fashion an order resembling a judgment for costs, which order would provide that petitioner's obligation to pay the filing fee is not permanently discharged but would arise again if and when she is no longer indigent and can pay the fee without undue hardship. We believe that such an order would not only be constitutionally permissible but would also further the congressional purpose of making the bankruptcy system, insofar as possible, self-supporting.

For the reasons stated above, it is

Ordered that the referee's decision be reversed and that petitioner's motion for leave to proceed in bankruptcy without prepayment of costs be and the same hereby is granted.